**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| RICHARD JOHNSON, | No. 20-15293 |
| *Plaintiff-Appellant*, | |
| | D.C. No. |
| | 2:18-cv-03055- |
| v. | MTL-ESW |
| | |
| CHARLES L. RYAN, named as Charles Ryan, Director of Arizona Department of Corrections; STACEY CRABTREE, Administrator of Offender Services Bureau; P. DAYS, Deputy Warden of Browning Unit; MONTONO, AKA Unknown Montano, First name unknown; Deputy Warden of Central Unit on or about 4-12-18 till 4-23-18, alias added pursuant to Doc #53; BELT, First name unknown; SSU Sergeant B, Special Security Unit Sergeant at Central Unit, | OPINION |
| *Defendants-Appellees*. | |

Appeal from the United States District Court
for the District of Arizona
Michael T. Liburdi, District Judge, Presiding

Argued and Submitted April 13, 2022
San Francisco, California

Filed December 15, 2022

Before:   Jay S. Bybee and Ryan D. Nelson, Circuit Judges,
and Jed S. Rakoff,[*] District Judge.

Opinion by Judge Bybee;
Partial Concurrence and Partial Dissent by Judge Rakoff

## SUMMARY[**]

### Prisoner Civil Rights

In an action brought pursuant to 42 U.S.C. § 1983 by Arizona inmate Richard Johnson, the panel (1) affirmed the district court's dismissal of Johnson's claim that the Arizona Department of Corrections's ("ADC's") annual reviews of his maximum security confinement were insufficient to satisfy the Due Process Clause of the Fourteenth Amendment; and (2) reversed the district court's summary judgment for defendants and remanded on Johnson's claims that his removal from the Department's Step-Down Program—a program by which inmates may reintegrate into close custody confinement—violated his rights under the

---

[*] The Honorable Jed S. Rakoff, United States District Judge for the Southern District of New York, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

First and Fourteenth Amendments.

Johnson's complaint alleged, in part, that after he was validated as a member of a Security Threat Group ("STG"), he was moved to maximum security confinement where he is confined to his cell for twenty-four hours per day, strip searched every time he leaves his cell, takes meals in his cell, and has limited access to rehabilitation programs. These conditions are substantially more restrictive than the general population from which he was moved. Johnson also alleges that he was denied the opportunity for restoration of lost earned release credits.

Addressing Johnson's claim that the ADC's annual review process of his confinement status violates due process, the panel held that Johnson has a liberty interest in avoiding assignment to maximum custody as a consequence of his STG validation. Nevertheless, Johnson failed to state a claim for a due process violation under the three-prong framework set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Johnson did not challenge the procedures by which he was initially validated as an STG member. Instead, he argued that ADC's annual reviews of his confinement status do not afford him adequate process because they are based solely on his alleged gang affiliation, without regard to his criminal history, propensity of violence, or disciplinary record within his past reclass review period or his disciplinary record overall. The panel held that ADC is entitled to substantial deference in its determination that an inmate's STG membership and failure to renounce and debrief poses a continuing security threat. Although Johnson disagreed with ADC's judgment, he failed to plausibly allege how that judgment created a risk that he will be erroneously classified as a security threat.

The panel next Johnson's claim that his removal from the Step-Down Program ("SDP") in 2018 violated his due process rights under the Fourteenth Amendment. The panel disagreed with the assertion that ADC has created a liberty interest in Johnson's participation in the SDP, concluding rather that the SDP is a process by which Johnson can leave maximum custody and regain eligibility for good-time credit and parole. Although Johnson had no liberty interest created by the SDP, he adequately stated a liberty interest in avoiding a return to maximum custody from close custody. Thus, it was not Johnson's removal from the SDP per se that created an atypical and significant hardship, but the change in Johnson's underlying conditions of confinement when he was moved. Because Johnson was not given a meaningful opportunity to learn of the factual basis for his transfer from close custody to maximum custody or to prepare a defense to the accusations, Johnson was likely denied due process in the procedures that resulted in his return to maximum custody. At the very least, the district court should not have granted summary judgment to defendants on this claim.

Addressing Johnson's First Amendment retaliation claim that he was removed from the SDP and returned to maximum custody because of his lawsuit against various ADC defendants, the panel noted that Johnson had a pending appeal in this court when he was removed from the SDP and transferred back to maximum custody. The panel held that viewing the evidence, including Johnson's declaration, in the light most favorable to Johnson, there was a genuine dispute of material fact with respect to whether Johnson's removal from the SDP and return to maximum security confinement reasonably advanced a legitimate penological purpose.

Concurring in part and dissenting in part, Judge Rakoff stated that while Arizona provides the mirage that a once validated member of an STG can later escape solitary confinement, the reality is that he will be kept there for the entire duration of his sentence. Believing that this is unconstitutional, as well as contrary to past holdings of this Court, Judge Rakoff dissented from the majority's analysis in Part III.A of its opinion, pertaining to Johnson's claim that Arizona's refusal to consider factors other than his initial STG validation and his subsequent failure to debrief denies him due process. And while Judge Rakoff concurred in Part III.B of the majority's opinion, which reverses and remands the district court's entry of summary judgment against Johnson on his claim that his removal from the SDP program violated due process, he wrote separately to emphasize that his claim is validly broader than the majority contends. Finally, Judge Rakoff concurred fully in Part III.C of the majority opinion with respect to Johnson's retaliation claim.

## COUNSEL

Brian Wolfman (argued) and Daniel Wassim (argued), Hannah M. Mullen, Madeline H. Meth, Samuel Myers, Sanders Keyes Gilmer, and Rebecca Van Voorhees, Georgetown University Law Center Appellate Courts Immersion Clinic, Washington, D.C., for Plaintiff-Appellant

Patrick J. Boyle (argued), Assistant Attorney General; Mark Brnovich, Attorney General of Arizona; Office of the Arizona Attorney General, Phoenix, Arizona; for Defendants-Appellees.

# OPINION

BYBEE, Circuit Judge:

Arizona Department of Corrections (ADC) inmate Richard Johnson is a validated member of a Security Threat Group (STG) and, pursuant to ADC's policy, has been assigned to maximum custody confinement. Johnson challenges two aspects of ADC's STG determination. First, he argues that ADC's annual reviews of his maximum security confinement are insufficient to satisfy the Due Process Clause of the Fourteenth Amendment. Second, Johnson claims that his removal from ADC's Step-Down Program (SDP)—a program by which STG inmates may reintegrate into close custody confinement—violated his rights under the First and Fourteenth Amendments. The district court screened his complaint, dismissing his claim regarding ADC's annual reviews for failure to state a claim. The district court later granted summary judgment to Defendants on Johnson's claims regarding his removal from the SDP. Johnson appealed, challenging both orders. We have jurisdiction under 28 U.S.C. § 1291. We affirm in part and reverse and remand in part.

## I. BACKGROUND AND PROCEEDINGS

A.    *Regulatory Background*

1.    ADC's security threat group policy

In 2005, the Supreme Court observed that "[t]he use of Supermax prisons has increased over the last 20 years, in part as a response to the rise in prison gangs and prison violence." *Wilkinson v. Austin*, 545 U.S. 209, 213 (2005) (citing Chase Riveland, U.S. Dep't of Justice, Nat'l Inst. of Corr., *Supermax Prisons: Overview and General*

*Considerations* 1 (1999)).    These facilities, sometimes
referred to as "jails within prisons," Riveland, *supra*, at 1,
are "more restrictive than any other form of incarceration,"
*Wilkinson*, 545 U.S. at 214.

In 1991, ADC addressed its own prison gang challenges
by adopting a Security Threat Group policy, referred to as
Department Order (DO) 806.  The policy's purpose is to
"minimize the threat that inmate gang or gang like activity
poses to the safe, secure and efficient operation of
institutions."    The policy defines an STG as "[a]ny
organization, club, association or group of individuals, either
formal or informal (including traditional prison gangs), . . .
whose members engage in activities that include . . .
committing or attempting to commit unlawful acts or acts
that violate the Department's written instructions, which
detract from the safe and orderly operation of prisons."
Ariz. Dep't of Corr., Dep't Order Manual, Dep't Order 806,
at 25 (2017) [hereinafter DO 806].    The policy
contemplates "[m]inimizing gang or gang like activity"
through two programs: (1) "the debriefing and segregation
of inmates who disavow gang membership," and (2) "a step-
down process for gang members who participate in
programming, reject gang activity and affiliation, and
remain disciplinary free."   DO 806 at 1.

ADC's process for confirming an inmate's membership
in an STG is called "validation," and entails the following
process.   When an inmate is first suspected of being an STG
member, the inmate is monitored for any STG-related
activity.   ADC collects any documentation and physical
evidence in support of the inmate's STG membership in an
STG Suspect File held by the Special Security Unit (SSU).
DO 806.03.   Once an inmate accrues at least ten points in
two or more of ADC's validation criteria, a "validation

packet" is prepared and sent to the STG Validation Hearing Committee. In the hearing, SSU presents the validation packet, the inmate presents his defense, and the STG Validation Hearing Committee determines whether the documentation supports validation as an active STG member. DO 806.04.1.7. If the committee finds that the documents support validation, the inmate has three options: He may renounce his STG membership, he may accept the validation but refuse to renounce his STG membership, or he may appeal his validation to the STG Appeals Committee. DO 806.04.1.8.

Validated STG members who refuse to renounce are assigned to maximum custody. DO 806.07. Male validated STG members, like Johnson, are housed in the ASPC-Eyeman Browning Unit (Browning Unit) for the duration of their incarceration. Validated STG inmates are ineligible for "restoration of forfeited time credits [and] . . . rescission of Parole Class III time." *Id.* 806.07.1.1. Furthermore, Johnson alleges that ADC conducts an annual review of maximum security inmates' status, but for STG inmates, these annual reviews consider only whether they are validated STG members and whether they have renounced and debriefed.

Conditions in maximum custody facilities such as the Browning Unit are very restrictive. Johnson alleges that he and other STG inmates in maximum custody are confined to their cells twenty-four hours per day, strip searched, and handcuffed behind their backs every time they leave their cells. In the Browning Unit, STG inmates are entitled to between $60 to $160 in weekly allowance at the store, one to three fifteen-minute phone calls per week, one to three two-hour non-contact visit blocks per week, and three three-hour recreation blocks per week in a chute enclosure with

the possibility that one block may be in a ten-by-ten foot enclosure. They also have access to the library, television, and mandatory rehabilitation programming, with the possibility of further access to hobby supplies, the job of pod porter, and eligibility for unrestrained escorts out of their cells. ADC has promulgated an Inmate Maximum Custody Management and Incentive System. Ariz. Dep't of Corr., Dep't Order Manual, Dep't Order 812 (2019) [hereinafter DO 812]. The program uses a "step incentive system" that provides inmates "the opportunity to participate in jobs, programs, and other out of cell activities" by which "inmates may progress from controlled based housing to open privilege based housing." DO 812.1.

2. Pathways out of maximum security

STG-validated inmates have two distinct paths to become eligible for custody reductions and housing status change. They must either renounce their STG membership and debrief or they must complete the SDP. DO 806.07.1.2.

a. Renouncing and debriefing

Renunciation is "[t]he process, in which a validated STG member agrees to renounce STG affiliation, successfully completes a debriefing, and is considered a former member." DO 806 at 25. Debriefing is a process by which the inmate provides ADC with information to convince ADC that the inmate has withdrawn from the STG. Debriefing permits ADC to get additional information about the STG so that ADC may manage the threat and to determine whether the inmate will need to be protected from other STG members and suspects. DO 806.06.1.1. A validated STG member is "[p]ermitted to renounce and debrief at any time." DO 806.07.1.1.9. If the inmate has debriefed to the satisfaction of the STG Validation Hearing Committee, the inmate is

placed in protective custody pending review of eligibility for lower custody housing or a double cell environment.  DO 806.07.1.5.1.  Inmates who successfully debrief may also request out-of-state placement.   DO 806.07.1.5.2.

b.      The Step-Down Program

The SDP "permits active inmates who have been validated as STG members, to remove themselves from STG activity and demonstrate to Department staff that they are no longer involved with STG activity."   ADC considers it to be an "alternative, indirect way of demonstrating a disassociation with gang activity [that] does *not* require renunciation and debriefing."   In order to participate in the SDP, a validated STG member must notify ADC in writing of his desire to participate in the program and must do so after a twenty-four-month period in which the inmate did not participate in STG activity or receive documented violations. DO 806.1.2.

The SDP is split into five "Phases."   Phases I through III take place in the Browning Unit and each lasts 180 days. DO 806.08.    At Phase I, inmates complete "general evidence based programs" such as diversity training, high school equivalence preparation, cognitive thinking, and other rehabilitative programming.   At Phase II, inmates are allowed outside of their cells individually and unrestrained in order to complete job assignments, and may walk to and from the shower and recreation unrestrained.   DO 806.08.1.5.2.    They may also participate in town hall meetings in non-contact cells, restorative justice programming, and other rehabilitative programming.   DO 806.08.1.5.2.1.   At Phase III, inmates are allowed two-person recreation periods, job assignments, and one meal each day with other SDP inmates in which they are

unrestrained. DO 806.08.1.5.3. They also continue programming, such as substance abuse activities, conflict resolution, domestic violence, and other treatment programs. DO 806.08.1.5.3. Phase IV involves transfer from the Browning Unit to a close custody unit and a four-week transition period in the close custody unit. DO 806.10.1.2. In the first week, SDP inmates may only eat and have recreation periods with other SDP inmates. DO 806.10.1.3. In the second, they may eat with other close custody inmates. DO 806.10.1.4.2. In the third, they may also have recreation periods with close custody inmates. DO 806.10.1.5.3. In the fourth week, inmates begin employment. DO 806.10.6.4. Upon completion of Phase IV, inmates begin Phase V, which is an indefinite period of monitoring. DO 806.10.1.7.

Inmates may be removed from the SDP for participating in STG activity or having a documented incident involving violence, a threat, a weapon, an improper use of a cell phone, or drug usage. DO 806.08.1.2. They may also be removed for participating in activities that adversely affect the safety of staff and the public, failing to complete all programming, and for disciplinary behavior that changes the inmate's classification or housing assignment. DO 806.11.1.4. At Phases I through IV, removals are documented, and the deputy warden for the inmate's assigned housing unit makes the final decision of whether to reinstate the inmate or terminate them from the SDP. DO 806.11.1. In these phases, inmates are not entitled to a revocation hearing or an appeal before the STG Appeals Committee, but the regular inmate grievance procedure remains available. Inmates removed at Phase V are entitled to a hearing before the STG Validation Hearing Committee with the right to an appeal to the STG Appeals Committee. DO 806.11.5.

An inmate terminated from the SDP must remain in maximum security for two years before he is eligible to participate again. DO 806.11.12. If an inmate is removed twice, he is permanently ineligible to participate in the SDP, although he may still renounce and debrief at any time. DO 806.11.13.

B.   *Johnson's Removal from the SDP*

In October 2014, the STG Validation Hearing Committee classified Johnson as a validated member of the Warrior Society STG. He appealed, and the STG Appeals Committee affirmed his validation. He was transferred to the ASPC-Eyman Browning Unit in November 2014.

Johnson enrolled in the SDP in November 2016. He was terminated from the program in December 2017, due to an inconclusive polygraph. After Johnson submitted an inmate grievance and received a hearing, ADC determined that he successfully passed a polygraph and was eligible for Phase IV. In April 2018, Johnson began Phase IV and was transferred to the ASPC-Florence Central Unit, a close custody unit.

Pursuant to ADC policy, SSU officers searched Johnson and his belongings when he arrived at the close custody unit. SSU Sergeant Belt prepared a memorandum that described three STG-specific documents found in Johnson's belongings: (1) a calendar code specific to the Warrior Society with the name and ADC number of another Warrior Society validated inmate written in code; (2) a roster of Warrior Society members housed in Wing IV at the Browning Unit; and (3) a micro-note from one Dine Pride STG member to another that included a roster of Dine Pride members in the Browning Unit and described other Dine

Pride activities.[1]    Then-Deputy Warden Ruben Montano stated that Belt's memorandum and evidence was sufficient to remove Johnson from the SDP because it demonstrated that he violated the program's prohibition on STG activity. Johnson was terminated from the SDP on April 23, 2018. When Johnson asked Belt why he was terminated from the SDP, Belt told him that "higher-ups" wanted Johnson off the yard and "jailhouse lawyers" were not welcome in Belt's unit.    After Johnson asked Belt why he was labeled a "jailhouse lawyer," Belt said, "you know why."

On April 23, 2018, Johnson received a notice of hearing regarding his proposed placement in maximum custody. He also submitted a written statement in connection with the hearing, but the copies provided by both parties are illegible. Johnson attended the hearing on April 25, 2018.    ADC staff determined that he would be returned to the Browning Unit because of his role as an active, validated STG member. Johnson was transferred back to the Browning Unit on April 30, 2018.

---

[1] Johnson contests ADC's characterization of these documents.    While noting that he "can only speculate" about the true nature of these objects, Johnson guesses that the calendar code was actually a "mind teaser," the roster of Warrior Society members was a list for a Native American pipe ceremony, and the micro-note was never given to him by its alleged author.    He provided declarations from other Native American inmates, who stated that they have been asked by SSU officers to make a list of pipe ceremony participants.    He also provided a declaration from Ladle Joey, the alleged author of the micro note, who stated that he never gave Johnson the micro note, but also admitted that "I am neither confirming nor denying that I am the author of the alleged 'micro note'" and that "I have not seen the actual 'micro note.'"    Finally, Johnson alleges that SSU officers have a history of submitting unreliable evidence as STG material because he previously had some materials seized for this reason and later returned, including an Apache-English dictionary.

Johnson contested his transfer back to the Browning Unit in two ways: through the grievance process and through an appeal of his maximum custody placement.  On May 2, 2018, he filed an informal grievance, and on May 15, 2018, he filed a formal grievance.  Both grievances argued that he did not receive adequate process for his removal from the SDP and raised the possibility of retaliation.  They further alleged that Johnson was not told the reason for his reassignment to maximum custody other than his status as an active STG member.  Deputy Warden Days denied his formal grievance, confirming that he was terminated for being an active STG member.  On June 8, 2018, Johnson appealed the denial of his formal grievance, and the appeals office told him that his removal was in compliance with department policy and that he failed to provide evidence of retaliation.

In the meantime, on June 17, 2018, Johnson filed an appeal of his maximum custody placement.  His appeal form repeated that he was not told the reason for his reassignment other than his status as an active STG member. The administrator of the Offender Services Bureau, Stacey Crabtree, denied the appeal, finding that Johnson was correctly classified to maximum custody based on the discovery of STG-specific documents in his belongings. After Johnson returned to the Browning Unit, SSU officers refused to tell him why he was terminated from the SDP, with one officer telling him that he "would need a 'court order' to know why [he] was terminated."  Johnson also sent a letter to ADC Director Charles Ryan.  Ryan never responded, but Johnson received a response from a division director stating that the current SDP policy did not require a hearing for inmates removed from Phases I–IV.

C.     *Proceedings Below*

Johnson filed suit under 42 U.S.C. § 1983 in the District of Arizona against Ryan, Crabtree, Days, Montano, and Belt seeking damages and an injunction ordering ADC to implement a behavior-based model for dealing with STG members.   His amended complaint raised three claims:   (1) violation of his due process rights under the Fourteenth Amendment for the failure to consider factors other than STG membership at annual reviews of his maximum custody status, (2) violation of his due process rights under the Fourteenth Amendment for his removal from the SDP, and (3) retaliation in violation of the First Amendment for his removal from the SDP for his previous litigation.   The district court screened his complaint under 28 U.S.C. § 1915A and dismissed Johnson's due process challenge to ADC's annual review process for failure to state a claim.   In that claim, Johnson had argued that the reviews should also consider his "criminal history, propensity of violence, or disciplinary record within his past reclass review[] period or Plaintiff's disciplinary record overall."   The district court held that "ADC's periodic review, combined with the ability to debrief at any time, satisfies due process," citing four other cases from the District of Arizona holding the same.[2]

On cross-motions for summary judgment, the district court granted summary judgment to Defendants on Johnson's remaining two claims.   With respect to Johnson's

---

[2] *See Mendez v. Ryan*, No. CV-12-0271-PHX-RHB (MHB), 2013 WL 6408389, at *8 (D. Ariz. 2013); *Standley v. Ryan*, No. CV 10-1867-PHX-DGC (ECV), 2012 WL 3288728, at *9–10 (D. Ariz. 2012); *Faulkner v. Ryan*, No. CV 10-2441-PHX-SMM (JFM), 2012 WL 407452, at *9–10 (D. Ariz. 2012); *Hernandez v. Schriro*, No. CV 05-2853-PHX-DGC (JJM), 2011 WL 2910710, at *8–9 (D. Ariz. 2011).

due process claim against Ryan, the district court held that Ryan was not involved in the decision to remove Johnson from the SDP and Johnson failed to allege that his removal was attributable to an unconstitutional policy, practice, or custom that could be attributed to Ryan.  With respect to Crabtree and Days, the district court found that neither defendant had the authority to order additional procedural safeguards for Johnson's termination.  Finally, with respect to Montano, the district court held that Johnson's liberty interest in avoiding the conditions of solitary confinement was adequately protected by ADC's periodic reviews of his confinement in addition to his ability to debrief at any time. The district court further held that Johnson did not have an independent liberty interest in remaining in the SDP because it is a program voluntarily administered by ADC and not required by the Due Process Clause.  On Johnson's First Amendment retaliation claim against Montano and Belt, the district court found that Johnson's previous lawsuits constituted protected conduct, but that Johnson failed to show how that conduct was the "substantial or motivating factor" behind his removal from the SDP.

Johnson timely appealed.

## II. STANDARD AND SCOPE OF REVIEW

We review de novo a district court's dismissal under 28 U.S.C. § 1915A.  *Byrd v. Phx. Police Dep't*, 885 F.3d 639, 640 (9th Cir. 2018).

> To survive § 1915A review, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. Moreover, we have an obligation where the petitioner is pro se, particularly in civil rights cases, to construe the pleadings

> liberally and to afford the petitioner the
> benefit of any doubt.

*Id.* at 642 (citations and quotations omitted).

We review de novo a district court's grant of summary judgment. *Transgender L. Ctr. v. Immigr. & Customs Enf't*, 46 F.4th 771, 778 (9th Cir. 2022). "We therefore employ the same standard used by the district court and must 'view the evidence in the light most favorable to the nonmoving party, determine whether there are any genuine issues of material fact, and decide whether the district court correctly applied the relevant substantive law.'" *Id.* (quoting *Animal Legal Def. Fund v. FDA*, 836 F.3d 987, 989 (9th Cir. 2016) (en banc) (per curiam)).

Johnson raises three issues on appeal. First, he raises a challenge under the Due Process Clause to ADC's policy of conducting annual reviews of the validation of STG members. Second, he claims the he had a liberty interest in the Step-Down Program and that his removal without a hearing violated his due process rights under the Fourteenth Amendment. Third, Johnson claims that the district court erred in granting summary judgment on his claim that prison officials retaliated against him by removing him from the SDP for filing prior lawsuits, in violation of the First Amendment. We will consider each issue in turn.

## III. WHETHER ADC's STG REVIEW VIOLATES DUE PROCESS

We first consider whether the district court erred when it screened Johnson's claim that ADC's annual reviews of his confinement status violate his due process rights under the Fourteenth Amendment. The Due Process Clause of the

Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. In order to analyze a procedural due process claim, we engage in a two-step analysis: First, we determine whether the inmate was deprived of a constitutionally protected liberty or property interest. Second, we examine whether that deprivation was accompanied by sufficient procedural protections. *See United States v. 101 Houseco, LLC*, 22 F.4th 843, 851 (9th Cir. 2022). In order to determine whether the procedural protections provided are sufficient at the second step, we look to (1) the private interest affected; (2) the risk of an erroneous deprivation and the probable value of any additional or substitute procedural safeguards; and (3) the government's interest. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

A.      *Johnson's Liberty Interest in Avoiding Maximum Security*

A liberty interest "may arise from the Constitution itself . . . or it may arise from an expectation or interest created by state laws or policies." *Wilkinson*, 545 U.S. at 221. The Constitution does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement, but such an interest may "arise from state policies or regulations." *Id.* at 221–22; *Meachum v. Fano*, 427 U.S. 215, 225 (1976) ("[T]he Due Process Clause [does not] . . . protect a duly convicted prisoner against transfer from one institution to another within the state prison system. Confinement in any of the State's institutions is within the normal limits or range of custody."). However, an interest in avoiding certain conditions of confinement "will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to

give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995) (citations omitted). "After *Sandin*, it is clear that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions. . . ." *Wilkinson*, 545 U.S. at 223.

Johnson has alleged sufficient facts to establish a liberty interest in avoiding maximum security confinement in the Browning Unit as a result of his STG validation. Johnson was not initially placed in the Browning Unit as a consequence of the crimes for which he was convicted and sentenced. *See Wilkinson*, 545 U.S. at 216 (noting that initial assignment to Ohio's supermax might follow "if the inmate was convicted of certain offenses"); *Myron v. Terhune*, 476 F.3d 716, 718 (9th Cir. 2007) (holding that an inmate has no liberty interest in his initial classification); *see also Prieto v. Clarke*, 780 F.3d 245, 254 (4th Cir. 2015) (rejecting a due process challenge to harsh conditions on death row). Johnson's complaint states that after he was validated as an STG member in 2014, he was moved to the Browning Unit, where he is confined to his cell for twenty-four hours per day, strip searched every time he leaves his cell, takes meals in his cell, and has limited access to rehabilitation programs. These conditions are substantially more restrictive than the general population from which he was moved. Johnson also alleges that he was denied the opportunity for restoration of lost earned release credits. The Supreme Court has held that similar conditions in an Ohio Supermax facility created a liberty interest because

they "impose[d] an atypical and significant hardship under any plausible baseline." *Wilkinson*, 545 U.S. at 223–24; *see also Brown v. Or. Dep't of Corr.*, 751 F.3d 983, 988 (9th Cir. 2014) (holding that solitary confinement for a fixed and irreducible twenty-seven month period created a liberty interest). We hold that Johnson has a liberty interest in avoiding assignment to maximum custody as a consequence of his STG validation.

## B.  *Sufficiency of Process*

Although we find that Johnson has a liberty interest, he fails to state a claim for a due process violation under the *Mathews* three-prong framework. In this appeal, Johnson does not challenge the procedures by which he was initially validated as an STG member. Instead, he argues that ADC's annual reviews of his confinement status do not afford him adequate process because they "are based solely on Plaintiff's alleged gang affiliation, without regard to his criminal history, propensity of violence, or disciplinary record within his past reclass review[] period or Plaintiff's disciplinary record overall."

### 1.  Balancing inmate and prison interests

In the context of prison gangs, the balance of private and public interests—that is, the first and third prongs of the *Mathews* analysis—weigh heavily in favor of ADC. On the inmate side, Johnson must accept that almost any placement in the Arizona prison system is a severely restricted environment, and that "the procedural protections to which [inmates] are entitled are more limited than in cases where the right at stake is the right to be free from confinement at all." *Wilkinson*, 545 U.S. at 225. On the state's side, "[p]rison security, imperiled by the brutal reality of prison gangs, provides the backdrop of the State's interest" and is a

"dominant consideration." *Id.* at 227. Indeed, we have described prison gangs as a "chronic problem" in which "gangs engage in extortion, drug trafficking, assault, and murder within the prisons." *Griffin v. Gomez*, 741 F.3d 10, 12 (9th Cir. 2014); *see United States v. Silverstein*, 732 F.2d 1338, 1341 (7th Cir. 1994) (describing the court's "horrifying glimpse of the sordid and lethal world of modern prison gangs"). We have observed that the assignment of gang affiliates to administrative segregation "is not a disciplinary measure, but an administrative strategy designed to preserve order in the prison and protect the safety of all inmates" and that "the assignment of inmates within the [State's] prisons is essentially a matter of administrative discretion." *Munoz v. Rowland*, 104 F.3d 1096, 1098 (9th Cir. 1997); *see also Bruce v. Ylst*, 351 F.3d 1283, 1289 (9th Cir. 2003) (acknowledging that "prisons have a legitimate penological interest in stopping prison gang activity"); Mark S. Fleisher & Scott H. Decker, *An Overview of the Challenge of Prison Gangs*, Corr. Mgmt. Q., vol. 5, issue 1, at 2–5 (2001) (recounting the history, organization, and impact of prison gangs). And in this context, "courts must give substantial deference to prison management decisions before mandating additional expenditures for elaborate procedural safeguards when correctional officials conclude that a prisoner has engaged in disruptive behavior." *Wilkinson*, 545 U.S. at 228.

In this case, ADC has determined that an inmate's STG status—the fact of membership in a gang, irrespective of his prison disciplinary record—is a sufficient indication of that inmate's security risk to justify continuing solitary confinement. Arizona is not alone in this assessment. As a report from the National Institute of Justice at the U.S. Department of Justice found: "Numerous responses to

combat gangs have been implemented throughout U.S. prison systems, but only one has been described as a 'silver bullet:' removing gang affiliates from the general population and placing them in restrictive housing." David C. Pyrooz, U.S. Dep't Justice, Nat'l Inst. of Just., *Using Restrictive Housing to Manage Gangs in U.S. Prisons* (June 30, 2018), https://nij.ojp.gov/topics/articles/using-restrictive-housing-manage-gangs-us-prisons (footnote omitted). As a consequence, "Corrections officials have, overwhelmingly, endorsed the use of restrictive housing for gang affiliates." *Id.*; *see*, *e.g.*, *Madrid v. Gomez*, 889 F. Supp. 1146, 1240–44 (N.D. Cal. 1995) (describing California's program for segregating prison gang affiliates). The proposition is not without controversy, even among corrections experts, but we owe substantial deference to ADC's judgment in making this prison management decision. ADC's judgment is broadly shared by other corrections officials, and we should not impose additional procedures lightly. *See Wilkinson*, 545 U.S. at 228.

### 2.  Risk of erroneous deprivation

With these considerations in mind, we turn to the second prong of the *Mathews* analysis. Given the procedures that ADC has in place, what is the risk that ADC officials will erroneously determine that Johnson remains a security risk to the prison? Johnson, with vigorous support from our dissenting colleague, argues two points. First, citing our decision in *Toussaint v. McCarthy*, 801 F.2d 1080, 1102 (9th Cir. 1986) (*Toussaint III*), *overruled in part on other grounds*, *Sandin v. Connor*, 515 U.S. 472 (1995), he argues that reviews of his confinement status cannot be "meaningless gestures" and must be held more frequently than once a year. *See* Dissenting Op. at 4 (*Toussaint III* "requires review of [segregated] placement more than once

per year"). Second, he argues that irrespective of the frequency of such retention reviews, the ADC's review process is inadequate because periodic reviews have never considered whether he remains a threat to the institution, but "consider[] only an initial STG validation and the subsequent failure to debrief." *See id*. at 9. We will address both points.

*The frequency of review of Johnson's gang status*. In *Hewitt v. Helms*, the Supreme Court set forth the general standard:

> [A]dministrative segregation may not be used as a pretext for indefinite confinement of an inmate. Prison officials must engage in some sort of periodic review of the confinement of such inmates. This review will not necessarily require that prison officials permit the submission of any additional evidence or statements. The decision whether a prisoner remains a security risk will be based on facts relating to a particular prisoner—which will have been ascertained when determining to confine the inmate to administrative segregation—and on the officials' general knowledge of prison conditions and tensions, which are singularly unsuited for "proof" in any highly structured manner.

459 U.S. 460, 477 n.9 (1983), *abrogated in part on other grounds, Sandin*, 515 U.S. 472.

We addressed the question of retention reviews in *Toussaint III*, 801 F.2d at 1101. To understand our

statements, some context is required.   *Toussaint* was a class action spanning nearly two decades and broadly addressing the conditions of confinement at four California prisons—San Quentin, Folsom, Deuel Vocation Institute at Tracy, and Correctional Training Facility at Soledad.   The litigation had an extensive history in the district court and in our court.[3]    Relevant to this case, the district court addressed the segregated housing practices at San Quentin and Folsom and described three justifications for segregating inmates: (1) because of "disciplinary rule infractions"; (2) because of "an institutional perception that they pose a threat to the safety of other inmates or staff, or to the security of the institution"; and (3) "because of a perception that the inmates themselves may be harmed by other inmates if they must mingle in the general population."   *Toussaint II*, 597 F. Supp. at 1393–94.   The district court also identified a fourth category, known as "administrative segregation," which was a catch-all for inmates assigned to segregated housing "pending a determination of whether he should be assigned more permanent 'segregated' status for one of the three reasons."   *Id.* at 1394.   It was for this fourth category that the district court expressed concern that "the decision to segregate is based on unverifiable hearsay or 'confidential

---

[3] *See generally Wright v. Enomoto*, 462 F. Supp. 397 (N.D. Ca. 1976), *aff'd* 434 U.S. 1052 (1978); *Wright v. Rushen*, 642 F.2d 1129 (9th Cir. 1981), *on remand*, 553 F. Supp. 1365 (N.D. Cal. 1983), *aff'd in part and vacated in part* sub nom. *Toussaint v. Tockey*, 722 F.2d 1490 (9th Cir. 1984) (*Toussaint I*), *on remand* sub nom. *Toussaint v. McCarthy*, 597 F. Supp. 1388 (N.D. Cal. 1984) (*Toussaint II*), *aff'd in part and rev'd in part*, 801 F.2d 1080 (9th Cir. 1986) (*Toussaint III*), *on remand* sub nom. *Toussaint v. Rowland*, 711 F. Supp. 536 (N.D. Cal. 1989) (*Toussaint IV*), *aff'd in part and rev'd in part* sub nom. *Toussaint v. McCarthy*, 926 F.2d 800 (9th Cir. 1991) (*Toussaint V*).   *See also Rowland v. U.S. Dist. Ct. for N.D. Cal.*, 849 F.2d 380 (9th Cir. 1988).

information' from a source of unproven reliability identifying the inmate as a gang member" and that inmates had been held continuously in lockup for more than one year, and "[some] had been so held for over two years." *Id.* at 1407 (footnote omitted). The district court issued a permanent injunction "to correct [the prisons'] arbitrary practices in imposing segregation for 'administrative' reasons, and in retaining prisoners in segregation" and required such inmates to "be released from segregation upon his Minimum Eligible Release Date (MERD), if any, or at the expiration of twelve (12) months" unless the inmate is afforded a hearing and it is determined that he fits one of the three justifications described above. *Id.* at 1424.

Both parties appealed the district court's injunction. We held that "the state's interest in maintaining security in San Quentin and Folsom is at least as great, if not greater, than the state's interest shown in *Hewitt*," as California's facilities were "composed of the most violent and anti-social offenders in the California prison system." *Toussaint III*, 801 F.2d at 1100. With respect to the decision to make the initial placement, we held that "due process only requires . . . an informal nonadversary hearing within a reasonable time after the prisoner is segregated." *Id.* (footnote omitted); *see id.* at 1100 n.20 (stating that "the district court's requirement that a hearing be held within 72 hours of segregation constitutes a 'reasonable time'" and "intimat[ing] no view as to whether due process would tolerate a more lengthy delay."). With respect to retention reviews, we noted recent decisions of the Third and Eighth Circuits[4] approving

---

[4] Those cases involved a very different set of circumstances, and neither case addressed the *Mathews* test. In *Mims v. Shapp*, 744 F.2d 946 (3d Cir. 1984), Burton had been segregated for five years for his role in a Pennsylvania prison riot in which a deputy warden was killed. The

monthly reviews of a prisoner's segregated status and, without further analysis, we concluded, "[w]e do not believe that annual review sufficiently protects plaintiffs' liberty interest.   However, we intimate no view as to the frequency of periodic review required.   That is for the parties to recommend and the district court to decide in the first instance."   *Id.* at 1101.

On remand, the district court addressed objections from the parties in response to a report from the prison monitor appointed to supervise the injunction.   *Toussaint IV*, 711 F. Supp. at 537.   The monitor recommended that inmates in

---

prison had reviewed his status every 30 days.   The question for the court was whether Burton had been denied "meaningful periodic review."   *Id.* at 948.   The district court found that Burton's retention was based on the subjective evaluation of prison officials, ordered Burton's release, and awarded damages.   The Third Circuit reversed.   The fact of the 30-day review period used by the prison to retain Burton for violation of prison disciplinary proceedings was not at issue and was mentioned only in passing.   *Id.* at 952.

In *Clark v. Brewer*, 776 F.2d 226 (8th Cir. 1985), Clark had been held in segregated status for seven years after he killed an inmate and a guard.   *Id.* at 228.   Under the Iowa prison procedures, an inmate's segregated placement was reviewed every seven days for the first two months and then monthly thereafter.   The district court ordered more frequent review, and the Eighth Circuit reversed with the observation that "[a] wide variety of situations will confront penitentiary officials, and while in one case the type of situation involved will necessarily require a relatively long period of segregation, in another only a short period of segregation may be necessary."   *Id.* at 234.   The court concluded that "the frequency of that review must in most cases be left to the informed discretion of prison officials" and "the frequency of hearings presently required by state policy is constitutionally sufficient. To require more frequent hearings would be of little or no benefit to any individual inmate while at the same time significantly increasing the administrative burden on penitentiary officials."   *Id.*

"indeterminate segregation" be reviewed every 90 days. The state objected and contended that review every 120 days was sufficient. Although the district court had previously approved up to a one-year retention review policy, the district court ordered the state to review inmates' segregated status every 90 days. *Id.* at 539–40. We reversed, with little analysis and without citation to any decision of any court, including our prior decision in *Toussaint III*:

> The Constitution does not support a nice distinction between 90 days and 120 days. The question is one of discretion. Is it to be the discretion of the prison administrators or the discretion of a district court? Nothing in the Constitution invests the district court with discretion to override the discretion of the prison officials on this administrative point. Here administrative discretion must prevail; 120 days satisfies due process.

*Toussaint V*, 926 F.2d at 803.

The *Toussaint* litigation is of limited usefulness in this case. Between *Toussaint III* and *Toussaint V*, we are left with bare *ipse dixit* that 120-day review of segregated status is constitutionally acceptable, a one-year period is too long, but anything in between those poles is to be left to the discretion of prison officials. Nevertheless, our declaration in *Toussaint III* that an annual review period was too long would bind us—if annual review were the exclusive form of relief for Johnson. It is not. Johnson may renounce his gang status and debrief at any time. At a minimum, his willingness to renounce and debrief would earn Johnson a

hearing to determine whether he had satisfied the criteria for renounce-and-debrief relief.

Because Johnson has not sought to renounce and debrief, we are hard-pressed to understand why annual review of STG status is not sufficient to satisfy the Due Process Clause. We need to be very precise here so that we cannot be misunderstood. We do not have inmates before us who are subject to maximum custody in Arizona for violations of disciplinary rules or have been segregated for their own protection, to use the language of the *Toussaint* litigation. *See Toussaint II*, 597 F. Supp. at 1393–94. Instead, Johnson is subject to segregation because he has been classified as a threat to the safety of the prison staff, other inmates, or the general security of institution. *See id.* That classification may encompass a variety of concerns. *See Clark*, 776 F.2d at 228 (inmate was subject to long-term segregation after numerous disciplinary reports and after he killed a guard and an inmate); *Mims*, 744 F.2d at 948 (inmate was subject to long-term segregation after killing a deputy warden). In Johnson's case, Arizona has articulated a particular concern. It has not alleged that Johnson has violated disciplinary rules or is an immediate threat to the staff or other inmates. Rather, Arizona is concerned that Johnson's gang membership presents an ongoing threat to the security of the prison, its staff, and its inmates. ADC's immediate concern is not conduct-based. It is based on Johnson's status as a member of the Warrior Society, which ADC has determined is an active prison gang and presents a general threat to the security of the prison. *See* Ariz. Dep't of Corr., *Security Threat Group (STG) Program Evaluation* 4 (2001) (noting, as of 2001, that the Warrior Society and the Sureños were the most recently certified STGs); *see also Greybuffalo v. Kingston*, 581 F. Supp. 2d 1034, 1048–50 (W.D. Wis. 2007)

(finding that the Warrior Society was created for the self-protection of Native American prisoners and is involved in criminal activities in prison); Nat'l Gang Intel. Ctr., *2013 National Gang Report,* FBI, https://www.fbi.gov/file-repository/stats-services-publications-national-gang-report-2013 (last visited Oct. 24, 2022) (listing the Warrior Society as one of the most significant prison gangs).

As we discuss in greater detail in the next section, Johnson's argument really amounts to a disagreement about what criteria the prison should consider in determining whether he remains a security risk and only secondarily challenges how often ADC reviews his STG status. But as the Supreme Court noted in *Hewitt,* periodic reviews do not necessarily require additional evidence and may rely on facts that were ascertained when the initial decision to confine the inmate to administrative segregation was made. 439 U.S. at 477 n.9. Unless Johnson can show that his initial validation as an STG was in error—a claim Johnson does not make—then his recourse for the time being is to renounce his membership, thereby altering his status as a Warrior Society member.[5] Neither Johnson nor the state has anything to gain by conducting monthly, 90-day, or 120-day reviews of Johnson's status as a gang member because nothing about his STG status has changed. Such periodic reviews would be useful to review conduct-based threats to prison security, but that is not the basis for Johnson's segregation. *See Madrid*, 889 F. Supp. at 1278 (noting that the "lack of continuing evidence of gang membership or activity is

---

[5] We need not address hypotheticals such as whether Arizona would have the same interest in segregating Johnson as an STG if, for example, by reason of age or infirmity, Johnson no longer represented a threat to the institution, even by virtue of his gang affiliation.

simply considered irrelevant since the justification for administrative segregation is the fact of gang membership itself, not any particular behavior or activity" and "the premise for finding that the inmate is a security risk—gang membership or association—is not affected by the lack of subsequent gang activity"). Because Johnson can initiate review of his segregated status at any time by indicating that he is prepared to renounce his membership, Johnson has some control over the review process. We will not engage in the empty formalism of requiring ADC to conduct a review at some point less than annually—every 364 days, for example—just to satisfy our broad statement in *Toussaint III*.[6] We hold that annual review of Johnson's gang status plus the possibility of the opportunity to renounce and debrief is sufficient to satisfy the demands of the Due Process Clause. *See Wilkinson*, 545 U.S. at 217 (noting that once an inmate has been placed in the Ohio supermax facility, "his placement is reviewed on at least an annual basis").

*Gang status as a threat to security.* That brings us to Johnson's second, and perhaps most important point: Johnson, buoyed by the dissent, believes that, irrespective of his validated membership in a prison gang, Johnson must be given the opportunity to demonstrate that he is not a threat-in-fact. *See* Dissenting Op. at 69 ("Johnson plausibly alleges that Arizona's current review process offers him and prisoners like him no effective way out of maximum custody even if they no longer pose any threat to prison security.").

---

[6] In the end, even the dissent concedes the formalism of requiring a more frequent periodic review because it would not matter to the dissent's analysis how often Arizona reviewed Johnson's placement. Dissenting Op. at 69.

But here is the dissent's critical premise: "gang affiliation, without regard to [Johnson's] criminal history, propensity for violence, or disciplinary record" is not sufficient cause to hold Johnson in segregated housing.   Dissenting Op. at 73. Thus by "den[ying Johnson] any 'meaningful opportunity' to demonstrate he was no longer a threat," Arizona has denied Johnson due process.   *Id*. at 75.

Johnson has framed his argument as a *Mathews v. Eldridge* challenge to Arizona's procedures.   Properly considered, his argument does not sound in procedural due process.   Rather, it is a fundamental disagreement with ADC's judgment that gang *status* is a sufficient grounds for placing Johnson, or any other gang member, in segregated housing.   Johnson and the dissent challenge ADC's judgment about what criteria the prison should consider in determining whether Johnson remains a security risk. Johnson's argument sounds in substantive due process, not procedural due process.[7]   *See United States v. Salerno*, 481 U.S. 739, 746 (1987) (describing the difference between the substantive and procedural components of the Due Process Clause); *Mills v. Rogers*, 457 U.S. 291, 299 (1982) (similar);

---

[7] We are not aware of any published decision from any court that supports Johnsons's and the dissent's theory.   We are aware that in 2001 an Arizona district court held that "due process requires more than just proof of status" and that holding an inmate in segregated housing on the basis of his validation as a member an STG without "evidence of misconduct . . . offends the Due Process Clause."   *Koch v. Lewis*, 216 F. Supp. 2d 994, 1007 (D. Ariz. 2001).   The district court in that case acknowledged that the argument sounded in substantive due process. *Id.* at 1003 ("the procedural component of due process is not at issue."). When the state's appeal became moot, the district court vacated its injunction but left its orders in place "for future 'persuasive force.'"   We vacated the district court's orders "in their entirety."   *Koch v. Schriro*, 399 F.3d 1100, 1100–01 (9th Cir. 2005).

*United States v. Quintero*, 995 F.3d 1044, 1051–52 (9th Cir. 2021) (similar). No additional process would satisfy the dissent's claim that status alone is not sufficient cause for maximum custody—hence the dissent's candid acknowledgment that it wouldn't matter "if Arizona reviewed Johnson's placement monthly or even daily" Dissenting Op. at 69—because it would not change ADC's judgment that STG status is a critical, determinative fact. *See Reno v. Flores*, 507 U.S. 292, 301–02 (1993) (stating that due process "includ[es] a substantive component, which forbids the government to infringe certain 'fundamental' liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest"); *Daniels v. Williams*, 474 U.S. 327, 331 (1986) (characterizing certain substantive due process rights as "bar[ring] certain government actions regardless of the fairness of the procedures used to implement them").

The proposition that gang membership alone threatens prison security is both outside of our expertise and too well established for us to consider *sua sponte* a substantive due process challenge to ADC's judgment. *Hewitt* established that prison officials' judgment that an inmate represents a threat to the safety of the prison may "turn[] largely on 'purely subjective evaluations and on predictions of future behavior'" and may be appropriate "*even if [the inmate] himself has committed no misconduct.*" 459 U.S. at 474 (emphasis added) (quoting *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 464 (1981)). In this case, ADC has made a subjective evaluation for which it is entitled to significant deference—it determined that an inmate's STG membership and failure to debrief represents a continuing and significant risk to prison safety such that it justifies the

inmate's confinement to maximum custody.  Thus, it is of no moment that Johnson and the dissent think there are "other factors bearing on Johnson's dangerousness [that] might lead to a different outcome."  Dissenting Op. at 70. So long as Arizona considers his STG status sufficient to merit maximum custody, other factors are irrelevant.  The irrelevance of these "other factors" reflects a substantive judgment about prison conditions and is far from a "typical procedural due process argument."  *Id.  Mathews* is of no application to the dissent's argument here.[8]

Johnson's confinement in maximum security is based on the well-documented, near existential threat that gangs pose to prison order.  *See Wilkinson*, 545 U.S. at 227 ("Clandestine, organized, fueled by race-based hostility, and committed to fear and violence as a means of disciplining their own members and their rivals, gangs seek nothing less than to control prison life and to extend their power outside prison walls."); Fleisher & Decker, *supra*, at 2–5.  In a lengthy, thorough opinion in *Madrid v. Gomez*, the district court for the Northern District of California reviewed California's approach to prison gangs and considered the conditions at Pelican Bay Prison, a modern facility designed to hold "the worst of the worst."  889 F. Supp. at 1155. The court found that "[a]lthough both prison gangs and

---

[8] Separating the strands of the Due Process Clause answers the dissent's claim that the district court erred in screening Johnson's complaint under 28 U.S.C. § 1915A.  *See* Dissenting Op. at 73–79.  Johnson has only brought a procedural challenge to ADC's STG review process.  The dissent has doubled-down on that argument and denies that Johnson has brought a substantive due process challenge.  *Id.* at 69–70.  Because it is clear that no change in ADC's review process would bring about a change in Johnson's classification, it was proper for the district court to screen Johnson's complaint.

disruptive groups [such as motorcycle and street gangs] pose threats to prison security, prison gangs are considered the greater threat." *Id.* at 1240.  Under California's policies, gang members or associates could be placed in segregated housing for an indefinite term, unless an inmate debriefs. *Id.* at 1241. The district court found that although segregated housing "contains an element of punishment and creates a deterrent effect," restrictive "conditions in the SHU serve to undermine [gang] networks and opportunities by separating gang members from one another." *Id.* at 1275.  The court also found that California "considered [an inmate] to be a security threat so long as the inmate is validated as a gang affiliate and has not yet debriefed . . . . even if the inmate has, for some period of time 'remained clean.'" *Id.* at 1278. It further explained that "[t]he lack of continuing evidence of gang membership or activity is simply considered irrelevant since the justification for administration segregation is the fact of gang membership itself, not any particular behavior or activity. . . .  Therefore, the premise for finding that the inmate is a security risk—gang membership or association—is not affected by the lack of subsequent gang activity." *Id.*  The court accepted the state's explanation and concluded that prison officials "do not violate due process by failing to give persuasive value to the fact that an inmate's record reflects an absence of gang-related activity or association over some period of time." *Id.* (footnote omitted).

As in *Madrid*, it is Johnson's continuing status as a gang member that is critical to the state's interest in maintaining him in maximum security.   It is appropriate for ADC to rely on Johnson's STG validation status as justification for its conclusion that he remains a security threat, and ADC is not required to consider additional evidence such as his criminal

history, propensity for violence, or his immediate past disciplinary history.   If the only evidence in Johnson's file was "for specific, serious misbehavior," then "more formal, adversary-type procedures might be useful" to avoid the possibility of administrative error.   *Wilkinson*, 545 U.S. at 228.

Johnson has not alleged any facts that would demonstrate that ADC's determination that he is a member of the Warrior Society is erroneous or that his STG status is being used pretextually.   For instance, Johnson does not allege that the ADC determination in his case is based on stale information or is so outdated as to be irrelevant to a current risk analysis. To the contrary, ADC's evaluation focuses on information that remains unchanged:   Johnson was properly validated as a member of the Warrior Society, he has not renounced his membership and debriefed, and the Society still operates as a prison gang and has active members in Arizona prisons. *See* Ariz. Dep't of Corr., *Certified and Monitored Security Threat Groups,* https://corrections.az.gov/warrior-society-0 (last visited Oct. 24, 2022); *but see* Dissenting Op. at 74 ("Arizona would still need to show that a years or decades–old STG validation, coupled with a prisoner's subsequent failure to debrief, actually *establishes* current gang status."). Thus, Johnson does not adequately allege that there exists a risk that ADC has erroneously declared him to be a security threat—Johnson (like the dissent) simply disagrees with ADC's judgment about what criteria are relevant.   But Johnson has not brought a substantive due process claim, and the Supreme Court has said that periodic reviews may be based on facts ascertained when initially assigning the inmate to administrative segregation.   *See Hewitt*, 459 U.S. at 477 n.9.

Johnson also suggests that ADC's reliance on his STG status and failure to debrief does not meet the "some evidence" standard because these periodic reviews consider only whether the prisoner "was previously validated" and "has debriefed." The "some evidence" standard requires courts to determine "whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455–56 (1985). This evidence must have "sufficient indicia of reliability." *Bruce*, 351 F.3d at 1288. Although the age of evidence could affect its weight, *Castro v. Terhune*, 712 F.3d 1304, 1315 (9th Cir. 2013), we do not reweigh evidence when determining whether there is "some evidence" for due process purposes, *Bruce*, 351 F.3d at 1287. Johnson does not challenge his initial validation or otherwise allege that this evidence is unreliable.

\*     \*     \*

Our review of the three *Mathews* prongs shows that ADC's annual reviews of Johnson's STG status are not constitutionally deficient. ADC is entitled to substantial deference in its determination that an inmate's STG membership and failure to renounce and debrief poses a continuing security threat. Although Johnson disagrees with ADC's judgment, he has failed to plausibly allege how that judgment creates a risk that he will be erroneously classified as a security threat. We affirm the district court's dismissal of Johnson's claim under 28 U.S.C. § 1915A for failure to state a claim.

C.     *Response to the Dissent*

Our dissenting colleague comes to the conclusion that ADC's description of its system for dealing with gang

membership is unconstitutional, *see* Dissenting Op. at 68 ("I do not believe that the possibility of debriefing suffices to render Arizona's otherwise unconstitutional practice constitutional"), and that additional factfinding is required to bring Arizona's program in line with the Constitution, *see Id*. at 73–79.   In addition to accepting Johnson's arguments, the dissent makes two additional points that merit response.

1.   Renouncing and debriefing as process

The dissent argues that renouncing and debriefing is not an effective way out of segregated housing.   *Id*. at 66, 73–75.   The dissent calls debriefing "euphemistic," "practically impossible," "a pseudo remedy," and a "mirage."   *Id*. at 66. Where the ADC regulations specify that a validated STG member is "[p]ermitted to renounce and debrief at any time," DO 806.07.1.1.9, and will then be considered to be a "former [gang] member," DO 806 at 25, the dissent dismisses renouncing and debriefing as "theoretical eligibility" that may not offer inmates "a plausible path" out of segregated housing.   Dissenting Op. at 76.   The dissent's principal explanation is a hypothetical that Johnson "may not be able to successfully debrief even if [he] wished."   *Id*. at 77.   The dissent explains that under ADC's regulation, an inmate who is renouncing and debriefing must "provide additional information regarding the STG's structure, activity and membership that would adversely impact the STG and assist in management of the STG population."   DO 806.061.1.2. Even though Johnson has never attempted to renounce and debrief, the dissent hypothesizes that Johnson will not be able to satisfy these criteria because "it is not at all clear how a prisoner who was validated eight years ago and has been held in solitary confinement ever since could possibly be in a position to provide any information that would 'adversely

impact the STG' or 'assist' the prison in 'management of the STG population.'" Dissenting Op. at 77.

These claims are not established anywhere in this record or the record of any other case, but are entirely of the dissent's own imagination. Debriefing has been widely used in prisons in this circuit. *See*, *e.g.*, *Hinojosa v. Davey*, 803 F.3d 412, 416–17 (9th Cir. 2015) (describing California's debriefing program), *rev'd on other grounds*, 578 U.S. 412 (2016); *Griffin*, 741 F.3d at 12 (same), *Madrid*, 889 F. Supp. at 1240–44 (same); Nev. Dep't of Corr., AR 446.03(3) (providing for a debriefing process); Wash. Dep't of Correc., DOC 470.500(IV) (providing for a debriefing process); *see also* Pyrooz, *supra*, ("Debriefing . . . remains an established route out of restrictive housing . . . .").[9]   And the record in one of our cases disclosed that debriefing has been used with success in the California system. *Griffin*, 741 F.3d at 12 (noting that "[o]ver a thousand inmates have been debriefed and released from [security housing units] in recent decades"); *see also* U.S. Dep't of Just., *Report and Recommendations Concerning the Use of Restrictive Housing* 25 (Jan. 2016) (describing the success of the federal STG Drop-Out Units). Arizona has not told us the recent history of its debriefing program, but in an academic study prepared in 2001 for ADC, the authors found that in the time frame for the study (1997–2001), some fourteen percent of validated STG members "renounced their gang affiliation

---

[9] Although debriefing remains a well-established off-ramp for STG members and affiliates—"particularly in prison systems that house large gang populations"—states have adopted "a broader range of policies and programs that encourage disengagement . . . including segregation diversion, gang renouncement, step-down and debriefing." Pyrooz, *supra* (footnote omitted). Arizona has adopted several of these policies and programs.

and were successfully debriefed by the STG Unit." *Security Threat Group (STG) Program Evaluation*, *supra*, at iii.

So long as Johnson refuses to renounce and debrief, the dissent's objection is not ripe. We will not make up objections to the debriefing program in the name of due process.

2. Protective custody and segregated housing

The dissent claims that renouncing and debriefing is ineffective as a way out of segregated housing because once an inmate renounces his gang membership he may be targeted by the gang and will end up in segregated housing as a protective measure. Dissenting Op. at 65–66, 75–76. The dissent objects that even if Johnson renounces and debriefs, he would be given "the opportunity to trade one form of solitary confinement for another." *Id*. at 76.

The problem the dissent identifies is real and is sometimes referred to as the "snitching" dilemma. *See Hinojosa*, 803 F.3d at 416 & n.3; *Griffin*, 741 F.3d at 13; *see also Gonzales v. Calif. Dep't of Corr.*, 739 F.3d 1226, 1234–35 (9th Cir. 2014). In the 2001 Arizona study of STGs, the authors found that "[t]he rate of renouncement . . . [was] low in part due to the threat of retaliation from members of the gang, and in part to the lack of a strong incentive to renounce, i.e., most renounced members remain in a supermax security unit." *Security Threat Group (STG) Program Evaluation*, *supra*, at iii. ADC is not blind to the problem. Its regulations contemplate that an inmate who has renounced and debriefed will be eligible for lower custody housing or transfer out of state, but ADC has acknowledged the reality that some inmates who renounce their gang membership may have to be placed in protective

custody, voluntarily or involuntarily. DO 806.07.1.5.1, 806.07.1.5.2; *Report and Recommendations Concerning the Use of Restrictive Housing, supra*, at 23 (observing that many inmates in protective custody have requested their removal from the general population; others are involuntarily removed).

The dilemma identified by the dissent cannot be avoided. But protective custody in segregated housing is only necessary as long as ADC or the inmate believes it is necessary to guarantee the safety of the inmate. It is not intended to be punishment for violation of prison rules or to protect others from the segregated inmate. It is for the protection of the former gang member and is the direct result of the inmate's own unfortunate past associational choices. The Supreme Court has reminded us that "[t]he safety of the institution's guards and inmates is perhaps the most fundamental responsibility of the prison administration." *Hewitt*, 459 U.S. at 473. Accordingly, "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (quotation marks and citation omitted). Prison officials must strike a careful balance to determine who must be protected from whom and for how long. *See Babcock v. White*, 102 F.3d 267, 268 (7th Cir. 1996) (describing the "logistical nightmare" prison gangs pose to safely housing inmates). We will not get into the business of telling state prison officials how best to protect the inmates they are charged with keeping safe.

Moreover, the dissent's ultimate conclusion cannot be correct. Having decided that renouncing and debriefing as a way out of segregated housing is illusory and that an inmate who debriefs will end up in segregated housing anyway as a protective measure, the dissent concludes that

"Arizona cannot satisfy due process." Dissenting Op. at 76. And if the Due Process Clause cannot be satisfied, then the inmate must be released from maximum custody. Put another way, in the dissent's view, if Johnson does not have a way out of segregated housing, he cannot be placed in segregated housing at all. The conclusion is contrary to the judgment of federal and state correctional officials and inconsistent with the studies showing that segregated housing is an effective means for controlling the threat of prison gangs to the safety of correctional officers and inmates. We cannot find any warrant in the Due Process Clause for this line of reasoning.

## IV.   REMOVAL FROM SDP AND DUE PROCESS

We now consider whether the district court erred in granting summary judgment to Defendants on Johnson's claim that his removal from the SDP violated his due process rights under the Fourteenth Amendment. As we have explained, inmates have a liberty interest in avoiding conditions of confinement that "impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. Johnson's argument is more specific—he argues that he not only has a liberty interest in avoiding the conditions of maximum custody, but that he has an *independent* liberty interest in the SDP such that ADC cannot remove him from the SDP without providing him with some kind of explanation and hearing. We will first consider whether Johnson has alleged a liberty interest in participating in the SDP. We conclude that he has not, but that he has a liberty interest in avoiding a change in his custody status that would return him to maximum custody. We will then discuss whether ADC has provided the adequate process to Johnson before depriving him of his liberty.

A.      *Participating in the SDP as a Liberty Interest*

As we discussed in the prior section, a liberty interest "may arise from the Constitution itself . . . or it may arise from an expectation or interest created by state laws or policies." *Wilkinson*, 545 U.S. at 221. Not every program or policy implemented by a state, however, creates a life, liberty, or property interest protected by the Due Process Clause itself. *See*, *e.g.*, *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974). We are not aware of any principle of constitutional law that would require Arizona to create a program such as SDP to permit a prisoner to exit solitary confinement. Thus, we turn to the doctrine of state-created liberty interests.

1.   The law of state-created liberty interests

The doctrine of state-created liberty interests, which developed primarily in the prisoners' rights context, has evolved parallel to the Supreme Court's doctrine of state-created property interests that began in the 1970s. *See id.* at 557–58. The "new property" revolution began with *Goldberg v. Kelly*, in which the Supreme Court acknowledged that welfare entitlements are "more like 'property' than a 'gratuity'" and concluded that the withdrawal of such statutory entitlements called for due process. 397 U.S. 254, 262 n.8 (1970). The Court developed the doctrine further in *Board of Regents of State Colleges v. Roth*, in which it held that property interests "may take many forms" and "are defined by existing rules or understandings that stem from an independent source such as state law." 408 U.S. 564, 576–77 (1972); *see also Perry v. Sindermann*, 408 U.S. 593, 601 (1972). The Court stated that "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for

it. . . . He must, instead, have a legitimate claim of entitlement to it." *Roth*, 408 U.S. at 577. Thus, the Supreme Court has instructed that a right to due process does not exist in the absence of some "underlying substantive interest" that "rises to the level of a legitimate claim of entitlement." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 757 (2005) (quoting *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9 (1978)).

In *Wolff v. McDonnell*, the Court addressed for the first time the extent to which incarcerated inmates have state-created liberty interests. A Nebraska statute awarded inmates "good-time credits," which allowed inmates credit toward early release for good behavior. 418 U.S. at 546 n.6. Nebraska's statutory disciplinary scheme allowed for forfeiture or withholding of such credit only for serious misconduct. *Id.* at 546–47. The Court held that nothing in the U.S. Constitution guaranteed inmates good-time credits, but once the state of Nebraska created a statutory framework for such credits, it created a liberty interest for which due process procedures were required before the inmate could be deprived of his interest. *Id.* at 557.

The Court further developed the doctrine in *Meachum v. Fano*, which addressed a claim by Massachusetts inmates that they were entitled to due process protection before being transferred from the general prison population to a maximum security institution for administrative reasons. 427 U.S. at 216–22. Looking to the nature of the interest at stake, the Court found that "[c]onfinement in any of the State's institutions is within the normal limits or range of custody . . . . That life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred." *Id.* at 225. The Court

acknowledged that *Wolff*'s approach to state-created liberty interests was consistent with *Roth, Sindermann, Kelly*, and other state-created property interest cases.   *Id.* at 226.

Unlike in *Wolff*, however, in *Meachum*, Massachusetts had not created a right for prisoners to remain in a particular prison or security level—Massachusetts did not condition transfer between prisons on the occurrence of specific events, and instead vested transfer decisions to the discretion of prison officials.   *Id.* at 226–28.   Thus, the Court held that the inmates did not have a liberty interest in avoiding transfer to less favorable conditions.   *Id.* at 228–29.   The Court reasoned that recognizing a liberty interest in any change in prison conditions "would subject to judicial review a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts."   *Id.* at 225.

After *Meachum*, the Court began to employ a methodology that required parsing mandatory language in state statutes and regulations to determine whether the state had created a liberty interest "by placing substantive limitations on official discretion."   *Olim v. Wakinekona*, 461 U.S. 238, 249 (1983), *abrogated in part on other grounds, Sandin v. Conner*, 515 U.S. at 472.[10]   In *Sandin v. Conner*, the Court abrogated this methodology in the

---

[10] *See*, *e.g.*, *Ky. Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 463–65 (1989) (finding that the absence of "substantive predicates" to guide discretion counseled against finding a liberty interest in visitation privileges); *Wakinekona*, 461 U.S. at 249 (finding that the absence of substantive limitations on official discretion in transferring prisoners negated any claim to a state-created liberty interest); *Hewitt*, 459 U.S. at 472 (finding that "repeated use of explicitly mandatory language in connection with requiring specific substantive predicates" created a liberty interest in avoiding administrative segregation).

prison context. 515 U.S. at 483 ("[W]e believe that the search for a negative implication from mandatory language in prisoner regulations has strayed from the real concerns undergirding the liberty protected by the Due Process Clause."). Instead, the Court "return[ed] to the due process principles . . . applied in *Wolff* and *Meachum*" that turned on the "nature of the deprivation." *Id.* at 481, 483. After *Sandin*, states may create liberty interests, but "these interests will be generally limited to freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.*" Id.* at 484 (citations omitted). The Court ultimately held that disciplinary segregation was not a dramatic departure from the ordinary incidents of prison life and therefore did not implicate a constitutional liberty interest. *Id.* at 486. After *Sandin*, we no longer parse state statutes and regulations for "mandatory language," but we look to the nature of the deprivation to determine if the state has created some "underlying substantive interest" that rises to the level of a legitimate claim of entitlement. *See Town of Castle Rock*, 545 U.S. at 757.

The Supreme Court has also made clear that, for purposes of due process analysis, substantive rights—life, liberty, and property—are distinct from the procedures that are designed to protect them. *See id.* at 758–68; *id.* at 772 (Souter, J. concurring) ("[T]he property interest recognized in our cases has always existed apart from state procedural protection."). In *Olim v. Wakinekona*, the Court held that an inmate did not have an independent liberty interest in processes that might protect him from transfer from a prison in Hawaii to a prison in California. 461 U.S. at 250. The Court noted that "[p]rocess is not an end in itself. Its constitutional purpose is to protect a substantive interest to

which the individual has a legitimate claim of entitlement."
*Id.* The mere fact that the State had provided procedures
"d[id] not create an independent substantive right" in those
procedures. *Id.* at 250–51. Similarly, in *Cleveland Board
of Education v. Loudermill*, the Court found that a state civil
service statute created a property right, the scope of which
was not defined by the procedures described in the statute.
470 U.S. 532, 538–41 (1985). The Court distinguished
between the substantive rights of life, liberty, and property
guaranteed by the Due Process Clause and constitutionally
adequate procedures. It noted, "The categories of substance
and procedure are distinct. Were the rule otherwise, the
[Due Process] Clause would be reduced to a mere tautology.
'Property' cannot be defined by the procedures provided for
its deprivation any more than can life or liberty." *Id.* at 541.
And, in *Town of Castle Rock v. Gonzales*, the Court held that
the plaintiff did not have a substantive interest in
enforcement of a restraining-order statute. 545 U.S. at 765–
66. In so holding, the Court rejected the argument that the
plaintiff was entitled to any "precise means of enforcement,"
such as an arrest warrant, that might be used to implement
the statute. *Id.* at 763. It noted that an entitlement to an
arrest warrant "would be an entitlement to nothing but
procedure—which we have held inadequate even to support
standing, much less can it be the basis for a property
interest." *Id.* at 764 (citation omitted).

In sum, although "[a] state-created right can, in some
circumstances, beget yet other rights to procedures essential
to the realization of the parent right," *Dumschat*, 452 U.S. at
463, a plaintiff does not have an *independent* right to those
procedures. *See Dist. Att'y's Off. for Third Jud. Dist. v.
Osborne*, 557 U.S. 52, 67–68 (2009) (holding that because a
plaintiff did not have a liberty interest in state executive

clemency, he therefore did not have an interest in "any procedures available to vindicate an interest in state clemency"). Only if a party has shown a liberty interest does the Due Process Clause require procedural protections before the state may deprive the party of his state-conferred interest. *See Dumschat*, 452 U.S. at 463 ("[T]he underlying right must have come into existence before it can trigger due process protection."). In this way, the Court's consistent adherence to the distinction between a substantive interest and procedure is consistent with the two-step analysis for the Due Process Clause. At the first step, we must be careful not to confuse procedure with the underlying substantive interest that gives rise to a legitimate claim of entitlement, because we will consider the adequacy of those procedures in protecting that entitlement at the second step.

Johnson argues that he has an independent liberty interest in remaining in the SDP under two theories: completion of the SDP is one way for him to secure good-time credits and parole eligibility, and completion of the SDP allows him to return to close custody and avoid the harsh conditions of maximum custody. We will address each theory separately.

2. Liberty interests and continued participation in the SDP

We disagree that ADC has created a liberty interest in Johnson's participation in the SDP. Completion of the SDP may be a means for acquiring eligibility for good-time credits, parole, and avoiding maximum security, but that does not establish an independent liberty interest in mere participation in the SDP. The SDP is one of several programs that ADC has provided Johnson to permit him to change his confinement status, including renouncing his

STG membership and debriefing, which he may do at any time. But the mere fact that ADC has provided Johnson with these programs does not create a liberty interest in them—the SDP "is not an end in itself." *Wakinekona*, 461 U.S. at 250. The SDP is no different than the procedures protecting an inmate from transfer in *Wakinekona*, the post-discharge review in *Loudermill*, or the arrest warrant in *Town of Castle Rock*. That is, the SDP is a *process* by which Johnson can leave maximum custody and regain eligibility for good-time credit and parole. It is not itself a liberty interest, but only one means by which Johnson can prove that he is prepared to return to the general prison population.

Johnson's loss of eligibility for good-time credits and parole is a consequence of his STG status, not a direct consequence of his failure to complete the SDP. *See* DO 806.07.1.1. That those benefits may be restored to a prisoner who reaches Phase V of the SDP or who completes other methods, such as debriefing, does not create a liberty interest in *participating* in the program at all. Johnson's participation in the SDP is the functional equivalent of an application for reassignment and restoration of eligibility for good-time credits and parole. The Court, however, has "never held that applicants for benefits, as distinct from those already receiving them, have a legitimate claim of entitlement protected by the Due Process Clause." *Lyng v. Payne*, 476 U.S. 926, 942 (1986) (citing *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 320 n.8 (1985)); *see Harisiades v. Shaughnessy*, 342 U.S. 580, 584–85 (1952) (rejecting the argument that "admission for permanent residence confers a 'vested right' on the alien"). Similarly, his placement in maximum custody results from his STG status, not the SDP.

Removal from the SDP does not itself constitute an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," for two reasons. *See Sandin,* 515 U.S. at 484. First, removal from the SDP during Phases I–III does not result in any significant change in an inmate's conditions of confinement. Phases I–III all take place in the Browning Unit, where STG validated inmates are housed. So underlying conditions of confinement are the same throughout these phases. Second, inmates in the general population and in other forms of administrative segregation do not have access to the SDP. The inmate removed from SDP has only lost access to one of several procedures by which he might change his conditions of confinement, and that alone is insufficient to create a liberty interest independent of any underlying change to Johnson's conditions. Our understanding is consistent with *Sandin*'s instruction that state-created liberty interests in the prison context are "generally limited to freedom from restraint." *Id.*

Our dissenting colleague disagrees. The dissent catalogues changes in an inmate's living conditions as he moves from Phase I to Phase III and concludes that "participation in *any* stage of the SDP . . . entails significantly more freedom from restraint and social exposure than ordinary placement in maximum custody." Dissenting Op. at 83. In addition, the Dissent argues that Johnson's underlying housing assignment is merely "collateral" to the SDP. *Id*. at 86.

We are not persuaded. As we noted *supra,* following *Sandin* and *Wilkinson*, only a change in placement that works an "atypical and significant hardship" creates a liberty interest protected by the Due Process Clause. *Wilkinson*, 545 U.S. at 224; *Sandin*, 515 U.S. at 484. In *Wilkinson*, the

Supreme Court observed that "[i]n *Sandin*'s wake the Courts of Appeals have not reached consistent conclusions for identifying the baseline from which to measure what is atypical and significant in any particular prison system." 545 U.S. at 223; *see Aref v. Lynch*, 833 F.3d 242, 253–56 (D.C. Cir. 2016) (surveying the cases). In *Ramirez v. Galaza*, however, we addressed what kinds of circumstances count as "atypical and significant." 334 F.3d 850 (9th Cir. 2003). Acknowledging that "[t]here is no single standard," we said that the inquiry should be guided by three considerations:

> 1) whether the challenged condition "mirrored those conditions imposed upon inmates in administrative segregation and protective custody," and thus comported with the prison's discretionary authority; 2) the duration of the condition, and the degree of restraint imposed; and 3) whether the state's action will invariably affect the duration of the prisoner's sentence.

*Id.* at 861 (quoting *Sandin*, 515 U.S. at 486–87); *see also Aref*, 833 F.3d at 255 (adopting similar criteria). Not every transfer accompanied by marginally harsher conditions creates a liberty interest. As the Court said in *Hewitt*, "transfer of an inmate to less amenable and more restrictive quarters for non-punitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence." 459 U.S. at 468. And in *Meachum*, the Court held that no liberty interest was implicated by a transfer that "place[d] the prisoner in substantially more burdensome conditions" because such transfers may be made on the basis of "informed predictions as to what would best serve institutional security or the safety and welfare of the inmate." 427 U.S. at 215, 225.

We have had few occasions to apply the guideposts we set forth in *Ramirez*, and the cases we have decided are not particularly helpful here.[11]  Nothing, however, in our cases would suggest that denying an inmate a two-person recreation period, favorable job assignments, unrestrained meals, unrestrained walks and access to the showers and recreation areas, or access to a GED program rises to the level of  an "atypical or significant hardship."  *See* Dissenting Op. at 83–84.  It is true that these changes to Johnson's circumstances in Phases II and III of the SDP are perquisites of the program, put in place by Arizona to encourage inmates to continue participating in the SDP.  These benefits may not feel trivial to an inmate who has been isolated and experienced only limited social contact.  But they do not represent a beyond-standard deviation from the ordinary circumstances of prison life. *See Sandin,* 515 U.S. at 484.

In these initial phases, Johnson remains in maximum custody.  Thus, there has been no material change in the *underlying condition of his confinement.*  Depriving an inmate like Johnson of these incidental, fleeting benefits does not introduce an "atypical and significant hardship" that would trigger a liberty interest.  *Id.*  If, as the dissent would hold, any incidental deprivation counts under *Sandin*, then we would have to "subject to judicial review a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts."  *Meachum*, 427 U.S. at 225.  We decline to

---

[11] *See*, *e.g.*, *Serrano v. Francis*, 345 F.3d 1071, 1078–79 (9th Cir. 2003) (holding an inmate denied the use of his wheelchair in a Special Housing Unit that was not designed to be handicapped accessible gave rise to a protected liberty interest).

follow the dissent down that road.  We thus disagree with the dissent that removing an inmate from "any prior phase" implicates a liberty interest under the Due Process Clause. Dissenting Op. at 84.**12**

### 3. Liberty interests and avoiding a return to maximum custody

Although we conclude that Johnson has no liberty interest *created by the SDP*, we think that Johnson has adequately stated a liberty interest in avoiding a return to maximum custody from close custody.  Once Johnson attained Phase IV, he was moved from maximum custody in the Browning Unit to a close custody facility—and that

---

12   We will not get ourselves in the business of second-guessing every decision that ADC officials must make to determine whether an inmate may advance to another phase or remain in the SDP program.  *See Sandin*, 515 U.S. at 482–83 (noting that an "undesirable effect[]" of *Hewitt* was "the involvement of federal courts in the day-to-day management of prisons" and cautioning against the broad establishment of liberty interests).  Only if an inmate successfully completes Phases I–IV will the inmate advance to Phase V, "an indefinite period of monitoring."  DO 806.10.1.7.  At all stages, the SDP process is fraught with discretionary judgment calls by ADC officials.  For example, to complete Phases I–III at the Browning Unit, an inmate must "[n]ot participate in any activity that could adversely affect the safety of staff, inmates and the general public"; "[c]omplete all positive programming"; and "refrain from disciplinary behavior."  DO 806.09.1.1.  These criteria invoke nearly every norm that prison officials hope to encourage in the prison setting.  Those criteria continue to apply to Phases IV and V, which take place at a close custody facility.  *See id.* 806.11.1.  Any violation of these criteria may result in the inmate being removed from the program or returned to repeat any phase.  }plain *Id.* 806.11.1.2, .6. At Phase V, the decision to terminate an inmate's participation or return an inmate to a previous phase rests with the STG Validation Hearing Committee, which has "full discretion based on the severity of the violation."  *Id.* 806.11.1.6.

move constituted a material change in his living conditions. His expulsion from Phase IV of the SDP meant that he was removed from close custody and returned to maximum custody. Johnson's liberty interest in avoiding maximum custody is clearly established: "After *Sandin*, it is clear that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is . . . the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'" *Wilkinson*, 545 U.S. at 223 (quoting *Sandin*, 515 U.S. at 484).[13]

In considering whether conditions of confinement impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," *Sandin*, 515 U.S. at 484, we may consider "whether the challenged condition mirrored those conditions imposed on inmates in administrative segregation and protective custody"; "the duration of the condition, and degree of restraint imposed"; and "whether the state's action will invariably affect the duration of the prisoner's sentence." *Brown*, 751 F.3d at 987 (quoting *Ramirez v. Galaza*, 334 F.3d 850, 861 (9th Cir. 2003)). In *Brown*, we held that an inmate had a liberty interest in avoiding confinement in an "Intensive Management Unit" because inmates in the unit were held in

---

[13] Our disagreement with the dissent regarding the SDP is limited: we agree that Johnson has a liberty interest in avoiding a return to maximum custody. *See* Dissenting Op. at 82–83. The dissent argues that "at the very least" Johnson should also have a liberty interest in Phases II and III because they "entail significantly more freedom from restraint and social exposure." *Id.* at 83. But as we explain, *Sandin* requires us to compare the SDP's perquisites to "ordinary incidents of prison life," 545 U.S. at 223, not simply whether those perquisites involve any change in the kinds of restraint imposed.

solitary confinement for over twenty-three hours a day, with limited exceptions for recreation and non-contact visits, and inmates were confined for minimum periods of twenty-seven months without meaningful annual review. *Id.* at 985, 988. In *Wilkinson*, the Supreme Court held that similar conditions, coupled with a loss of parole consideration, constituted an atypical and significant hardship that gave prisoners a liberty interest in avoiding assignment to Ohio's Supermax facility. 545 U.S. at 223–24.

The facts of this case parallel *Brown* and *Wilkinson*. Johnson's declaration states that, in maximum custody, he is confined to his cell twenty-four hours per day and is strip searched and handcuffed when he leaves his cell. DO 812 permits inmates a maximum of three phone calls per week, three non-contact visits per week, and three three-hour recreation opportunities per week. Per Arizona regulations, maximum-custody inmates require single-cell housing, are escorted in full restraints any time they move within the institution, are frequently monitored, and have only limited work opportunities within the secure perimeter. DO 801.01.12.4. These conditions are similar to those described in *Brown* and *Wilkinson*. *See Wilkinson*, 545 U.S. at 214 (Supermax inmates are permitted one hour of recreation per day and rare opportunities for non-contact visitation); *Brown*, 751 F.3d at 985 (segregated inmates are permitted thirty minutes of recreation per day and two non-contact visits per month).

By contrast, inmates in close custody have significantly greater freedom than those in maximum custody. Close-custody inmates live at different facilities from maximum-security inmates and enjoy reduced security protocols. *See generally* Ariz. Dep't of Corr., Dep't Order Manual, Dep't Order 801 [hereinafter DO 801] at 2. Close-custody

inmates are permitted double-cell housing, have greater freedom to work, and can move inside the institution without full restraints. DO 801.01.1.2.3. And although close-custody SDP participants remain separate from other inmates during meal and recreation times, DO 806.10.1.3.3, 1.4.2–.3, they are exempt from the Browning Unit's mandatory education programs. At Phase IV of the SDP, inmates can reintegrate with a close-custody general population unit, DO 806.09.1.2, just as Johnson transferred to the ASPC-Florence Central Unit, a close custody unit, to begin Phase IV.

Thus, it is not Johnson's removal from the SDP *per se* that creates an atypical and significant hardship, but the change in Johnson's underlying conditions of confinement when he was moved from close custody and returned to the Browning Unit. *See Wolff*, 418 U.S. at 571 n.19 (noting that the "imposition of 'solitary' confinement" requires procedural protection because it "represents a major change in the conditions of confinement"). We conclude that Johnson's return to maximum security from close custody implicates a liberty interest under the Due Process Clause. We so conclude even though the SDP only contemplates a four-week duration for Phase IV. DO 806.10.1.2. Our holding is limited to Johnson's removal from Phase IV of the SDP and consequent return to maximum custody confinement.

B.    *Removing Johnson from SDP and Sufficiency of Process*

Because we find that Johnson has alleged a liberty interest in avoiding the conditions of maximum custody, we must determine whether the procedures he was provided when he was moved from the Florence Central Unit to the

Browning Unit in April 2018 were constitutionally adequate. We proceed with the *Mathews* analysis.

As we noted above, in the prison context, the first and third *Mathews* factors—Johnson's interests and ADC's interests—weigh heavily in favor of ADC. Because this case involves the assignment of an inmate to maximum custody based on his membership in a prison gang, Johnson's private interest is limited, and ADC has a strong interest in mitigating the threat of STGs to prison security. *Compare Wilkinson*, 545 U.S. at 225 ("The [inmate's] private interest at stake here, while more than minimal, must be evaluated, nonetheless, within the context of the prison system and its attendant curtailment of liberties."), *with id.* at 227 ("In the context of prison management, . . . [the state's] interest is a dominant consideration."). Although we must afford ADC great deference in its prison management decisions, that deference is not unlimited.

Under the second *Mathews* factor, we consider the risk that under its procedures, ADC will erroneously reassign Johnson to maximum security. We may also consider "the probable value, if any, of additional or alternative procedural safeguards." *Id.* at 225 (quoting *Mathews*, 424 U.S. at 335). The district court held that Johnson's liberty interest was adequately protected by ADC's annual reviews of his confinement in addition to his ability to renounce and debrief at any time. Although annual reviews and the opportunity to renounce and debrief might be adequate to protect an inmate's liberty interest in avoiding *retention* in solitary confinement, we conclude that they are insufficient for protecting a liberty interest in avoiding *reassignment* to such conditions. *See Toussaint III*, 801 F.2d at 1098–1101 (analyzing separately the adequacy of procedures for placement and retention in solitary confinement).

The Supreme Court's "procedural due process cases have consistently observed that [notice of the factual basis for a decision and a fair opportunity for rebuttal] are among the most important procedural mechanisms for purposes of avoiding erroneous deprivations." *Wilkinson*, 545 U.S. at 226. Under the SDP policy, an inmate removed from Phase IV—which will result in the inmate's transfer from close custody to maximum custody—is entitled to a hearing including ten days' notice "to enable the inmate time to prepare a defense," written notice of the decision, and a right of appeal. DO 806.11.1.4–.10. The SDP policy does not provide for a hearing for inmates removed from the SDP at Phases I–IV, but ADC has said that inmates may challenge their removal through the ordinary grievance procedure.[14]

Before Johnson was transferred back to the Browning Unit, he was given notice of and attended a hearing on his maximum custody placement.[15] However, the notice only states that Johnson was being returned "as an active validated security threat group inmate." Nothing in that notice would have apprised Johnson of the reason for his

---

[14] The SDP removal policy, DO 806.11, was amended in 2018 and the amended regulation applied to Johnson. Prior to 2017, the SDP provided that "[a]ll recommendations for the removal of an inmate from the Step-Down Program" were subject to the notice, written recommendation, and appeal. DO 806.11.1.1 (July 12, 2017 version).

[15] Johnson filed a statement on April 25, 2018, in connection with his hearing in which he complained of his reclassification. There is additional detail in his statement, but we cannot read the copies provided by either Johnson or ADC. We are thus unable to discern how much Johnson knew about the nature of the hearing and the grounds for ADC deciding to return him to maximum custody. On remand, consistent with the explanation that follows, the district court may wish to explore this issue further.

reassignment.   Johnson had been a validated STG member since 2014; thus, the notice did not propose a change in his status, only a continuation of his status.

Johnson filed grievances indicating that he was never told why he was being moved back to the Browning Unit other than that his SDP status was revoked and he had been determined to be an "active validated [STG] inmate." Deputy Warden Days denied Johnson's formal grievance on June 1, 2018.   Days acknowledged that Johnson had asked for a revocation hearing.   For the first time, Johnson learned that he had been removed from close custody because he had violated "one or several of the criteria" in DO 806.08 and 806.09 for remaining in the SDP.   Days stated, "No revocation hearing is needed for inmates removed from phases I through IV."   Johnson appealed and again complained of the lack of process he received:

> I was . . . led to believe that I would need a court order to see what is being used against me to have me transferred back to maximum security.   (I was perfectly clear in my I/M grievance that I haven't been told why I was rolled up from central unit). . . . I don't have an administrative appeal process available to me to dispute, rebut, and/or appeal this arbitrary decision that (puts me) a level away from being kept (in maximum security indefinitely for a non-disciplinary reason.)

(spelling and punctuation in original).   His grievance appeal was denied, and he was told only that "[y]our removal from the STG Step Down Program was done in accordance with Department Policy."

Johnson's notice of appeal from the hearing decision, filed on June 17, 2018, tells a similar story. He complained that he "was given no information other than box 5 being checked on [the notice of hearing] and a statement saying I am being returned to Browning as 'an active validated [STG] inmate.'" He further stated that he learned *after* the hearing that he was accused of violating several criteria in DO 806:

> I have learned that Central Unit's deputy warden removed me arbitrarily from the STG Step-Down Program (SDP) due to violating 1 or several criteria's outlined in Dept. Order 806. . . . Prison officials are refusing to tell me how many incident(s) I have allegedly violated and what are the substance of those alleged incident[s]. . . . I am not being given a revocation hearing to view, to dispute, to rebut, or to appeal these alleged incident(s) of violations.

His appeal was denied on July 24, 2018. In the denial, Crabtree advised him in the most general terms that the factual basis for his return to maximum custody was "your recent [STG] documented activity found in your belongings during a search by SSU officers on April 13, 2018." This bare-bones explanation came three months after Johnson's hearing.

In light of this record, the procedure that it appears Johnson was given was not adequate to satisfy the Due Process Clause. Johnson was not given a meaningful opportunity to learn of the factual basis for his transfer from close custody to maximum custody or to prepare a defense to the accusations. Johnson may or may not have violated the criteria for remaining in close custody, but the prison

officials making that decision should make informed decisions—and the record available to us does not specify whether Johnson was made aware of the allegations against him. Without notice of the evidence against him, Johnson could not meaningfully respond and his hearing could not constitute an informed one. *See Hewitt*, 459 U.S. at 476 (holding that an inmate being considered for transfer to administrative segregation is entitled to "some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation"); *cf. Melnik v. Dzurenda*, 14 F.4th 981, 986 (9th Cir. 2021) (holding, in the context of a prison disciplinary hearing, that a prisoner had a due process right to access evidence to be used against him). We have some frustration with the quality of the copies in the excerpts of record that deal with Johnson's complaints concerning his hearing. From the evidence before us, Johnson was not given an adequate hearing before he was reassigned to maximum custody. At the very least, the district court should not have granted summary judgment to Defendants.

The district court addressed the individual liability of Ryan, Crabtree, Days, and Montano based on their authority for implementing the SDP, rather than their individual responsibility for denying Johnson notice of the factual basis for his change in conditions and an opportunity to present a rebuttal. On remand, the district court should decide in the first instance whether each defendant is individually liable for the constitutional deprivation as described in this opinion.

\*     \*     \*

In sum, the district court was correct in finding that Johnson does not have an independent liberty interest in participation in the SDP process, but it erred in concluding that Johnson's liberty interest in avoiding reassignment to the restrictive conditions of the Browning Unit was adequately protected by the procedures he was provided when he was moved from close custody to maximum custody in April 2018. We also conclude that Johnson was likely denied due process in the procedures that resulted in his return to maximum custody. We reverse the district court's grant of summary judgment for Defendants on Johnson's Fourteenth Amendment due process claim and remand for further proceedings.

## V. JOHNSON'S FIRST AMENDMENT RETALIATION CLAIMS

Johnson alleges that he was removed from the SDP and returned to maximum custody because of his lawsuits against various ADC defendants. The district court granted summary judgment to Defendants, finding that the record did not support Johnson's assertions that his lawsuits were a substantial or motivating factor behind his removal.

"The most fundamental of the constitutional protections that prisoners retain are the First Amendment rights to file prison grievances and to pursue civil rights litigation in the courts." *Entler v. Gregoire*, 872 F.3d 1031, 1039 (9th Cir. 2017) (footnotes omitted). "[B]ecause purely retaliatory actions taken against a prisoner for having exercised those rights necessarily undermine those protections, such actions violate the Constitution quite apart from any underlying misconduct they are designed to shield." *Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2005). We have said

that a First Amendment claim in this context has five elements: (1) adverse action by a state actor against the inmate (2) because of (3) that prisoner's protected conduct, and the action (4) chilled the inmate's exercise of his First Amendment rights and (5) did not reasonably advance a legitimate correctional goal.  *Chavez v. Robinson*, 12 F.4th 978, 1001 (9th Cir. 2021).

The parties agree that Johnson's removal from the SDP and transfer to maximum custody was an adverse action, that his lawsuits were protected First Amendment conduct, and that the adverse action chilled his exercise of such conduct. For purposes of summary judgment, a factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Ochoa v. City of Mesa*, 26 F.4th 1050, 1055 (9th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The parties disagree on the existence of a dispute of material fact regarding whether Johnson's removal was in retaliation for his First Amendment activity and whether removal advanced a legitimate penological goal.

A.     *Retaliatory Motive*

To establish a retaliatory motive, an inmate "must show that his protected conduct was the substantial or motivating factor behind the defendant's conduct."  *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009) (quotations omitted) (quoting *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989)).  In *Bruce v. Ylst*, we held that an inmate presented a genuine dispute of material fact with respect to a retaliatory motive when he was validated as a gang member shortly after the success of his prison grievances, stale evidence was used against him for validation, and he offered a declaration alleging that a

corrections officer told him that "higher-ups" instructed the officer to validate him because of his "complaints and protests." 351 F.3d at 1288–89.

In this case, Johnson had a pending appeal before us when he was removed from the SDP and transferred back to the Browning Unit. *See Johnson v. Bendel*, 745 F. App'x 750, 751 (9th Cir. 2018). His declaration also described an encounter with Belt—the author of the memorandum that provided the basis for Johnson's removal from the SDP—in which Belt told Johnson that "higher-ups" wanted Johnson off the yard and that "jailhouse lawyers" were not welcome in Belt's unit. Defendants characterize these facts as speculative, but we must view this evidence in the light most favorable to Johnson. *See Transgender L. Ctr.*, 33 F.4th at 1193. These facts, if true, would allow a reasonable jury to return a verdict in Johnson's favor, so Johnson has raised a genuine dispute of material fact. *See Bruce*, 351 F.3d at 1289.

B. *Reasonable Advancement of a Legitimate Correctional Goal*

Johnson bears the burden of proving the absence of a legitimate correctional goal for the adverse action. *See Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995). Defendants argue that Johnson's removal advanced the legitimate correctional goal of curtailing prison gang activity and that Johnson's removal was supported by the evidence described in the Belt memorandum. In *Bruce,* we acknowledged that prisons have a legitimate interest in stopping prison gang activity, but held that this general justification was insufficient to show reasonable advancement of a legitimate correctional goal on summary judgment. 351 F.3d at 1289. We noted that, in light of the

genuine dispute of material fact as to whether the action was taken with retaliatory motive, the defendants could not "assert that Bruce's validation served a valid penological purpose, even though he may have *arguably* ended up where he belonged." *Id.* (emphasis in original).

As in *Bruce*, even if Johnson "arguably ended up where he belonged," the presence of a genuine dispute of material fact with respect to a retaliatory motive means that Defendants' general justification for the action is not sufficient to defeat summary judgment. *Id.* (emphasis omitted). Put differently, if Belt and Montano used procedures outlined in ADC's policies to remove Johnson from the SDP and transfer him back to the Browning Unit in order to punish Johnson for his lawsuits, their use of these procedures was pretextual and not a *reasonable* advancement of the legitimate penological goal of stopping prison gang activity. Johnson contests whether the documents described in the Belt memorandum are actually STG-specific. He provided alternative characterizations of the documents in question and evidence of SSU officers seizing materials that they had mistaken for STG material.

Viewing this evidence in the light most favorable to Johnson, we find that there is a genuine dispute of material fact with respect to whether Johnson's removal from the SDP and return to the Browning Unit reasonably advanced a legitimate penological purpose.

\*     \*     \*

We reverse the district court's grant of summary judgment to Defendants on Johnson's First Amendment retaliation claim and remand for further proceedings.

## VI. CONCLUSION

We affirm the district court's screening and dismissal of Johnson's Fourteenth Amendment due process claim regarding the adequacy of ADC's annual review process. We reverse the district court's grant of summary judgment for Defendants on Johnson's Fourteenth Amendment due process claim, holding that Johnson had a liberty interest in avoiding reassignment to maximum security and that there is a genuine dispute of material fact with respect to whether he was afforded constitutionally adequate process. Finally, we reverse the district court's grant of summary judgment on Johnson's First Amendment retaliation claim. We remand this case to the district court for further proceedings consistent with this opinion.

**AFFIRMED in part, REVERSED and REMANDED in part.**

RAKOFF, District Judge, concurring in part and dissenting in part:

Since 2014, Richard Johnson has been held in highly restrictive conditions approximating solitary confinement because Arizona at that time "validated" him as a member of a prison gang or Security Threat Group ("STG"). Although there is no basis to believe that Johnson has been involved in any STG activity since then -- indeed, the restrictive nature of his confinement virtually precludes such involvement -- Arizona, Johnson alleges, provides no reasonable way he can demonstrate he is not a threat to prison security and exit solitary confinement. It thus violates his constitutional

liberty rights. Specifically, Johnson alleges that Arizona offers validated STG members no viable way out of these extremely restrictive conditions short of what is euphemistically termed "debriefing." But "debriefing" consists not only of renouncing gang membership, but also informing on other gang members, which is practically impossible for someone who has had no access to other gang members for eight years. In short, it is a pseudo remedy. Moreover, Johnson alleges, since meaningful "debriefing" is premised on being an informant, the fact that Johnson would then be regarded as a "snitch" (even if he weren't) would mean that he would face potentially deadly threats to his safety that could only be protected against by putting him back in solitary confinement or its equivalent. In short, while Arizona provides the mirage that a once validated member of an STG can later escape solitary confinement, the reality is that he will be kept there for the entire duration of his sentence. Believing that this is unconstitutional, as well as contrary to past holdings of this Court, I dissent from the majority's analysis in Part III.A of its opinion and would instead reverse the district court's dismissal on the pleadings of Count III of Johnson's complaint. And while I concur in Part III.B of the majority's opinion, which reverses and remands the district court's entry of summary judgment against Johnson on his claim that his removal from the Step Down Program ("SDP") violated due process, I write separately to emphasize that his claim is validly broader than the majority contends. Finally, however, I do concur fully in Part III.C of the majority opinion with respect to Johnson's retaliation claim.

## I. Whether Arizona may confine prisoners in maximum custody based solely on prior STG status and the failure to debrief.

### A. The Alleged Deficiencies in Arizona's Process

In Count III of his complaint, Johnson alleges that Arizona has denied him due process by continuing to confine him in "maximum security solitary confinement"[1] since 2014 based on his "validation" at that time as an STG member. First Amended Complaint ("FAC") ¶¶ 33–42. He likewise alleges that the only way for him to ever leave maximum custody is by participating in the SDP -- a limited-eligibility program (described further below) that Arizona maintains it need not allow prisoners to participate in even if they are eligible -- or by "debriefing." FAC ¶¶ 3, 39-42. As to the latter, while Arizona conducts a yearly hearing to review Johnson's maximum security placement, hearing officials have no discretion but to continue that placement so long as Johnson has not debriefed. FAC ¶ 37.

I agree with the majority that Johnson has adequately alleged a liberty interest in avoiding his extremely restrictive conditions of confinement. Opinion at 18-20. I likewise agree with the majority that Arizona, in order to deprive Johnson of this liberty interest, must make some judgment that Johnson remains a threat to prison safety. Opinion at 32. But I disagree that Johnson "has failed to plausibly allege

---

[1] As explained in the majority opinion, Arizona confines prisoners in maximum custody to their cells for 24 hours per day outside a small number of weekly recreation or visitation blocks or phone calls, before which prisoners are strip searched and handcuffed behind their backs. Opinion at 8-9. Prisoners in maximum custody are also denied eligibility for various earned time credits that could result in reductions to their custodial terms.

how that judgment creates a risk that he will be erroneously classified as a security threat." Opinion at 34-35. This is so for two reasons.

*First*, and very simply, we have previously held that the risk that a prisoner will be wrongly confined in solitary confinement or similarly restrictive conditions requires review of that placement more than once per year. *Toussaint v. McCarthy* (*Toussaint III*), 801 F.2d 1080, 1101 (9th Cir. 1986) ("We do not believe that annual review sufficiently protects plaintiffs' liberty interest."). *See also Toussaint v. McCarthy*, 926 F.2d 800, 803 (9th Cir. 1990) ("*Toussaint V*") (holding that review every 120 days satisfied due process). Here, Johnson alleges that Arizona reviews his placement in what he calls solitary confinement only once per year. FAC ¶ 37. The majority describes our conclusion in the *Toussaint* litigation -- that prisons must review prisoners' placement in extremely restrictive custodial conditions such as Johnson's more than once a year, but that review every 120 days is sufficient -- as "bare *ipse dixit*." Opinion at 27. But this sensible balancing of the benefits and costs of additional process is precisely the balancing required under the Supreme Court's familiar framework for evaluating procedural due process claims. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

The majority nonetheless acknowledges that *Toussaint III* is good law and that, under it, Arizona's annual review process would deny Johnson due process except (the majority contends) for the fact that Johnson could supposedly exit maximum security by "renounc[ing] his gang status and debrief[ing] at any time." Opinion at 27. For the reasons described below, I do not believe that the possibility of debriefing suffices to render Arizona's otherwise unconstitutional practice constitutional, and

especially not at the pleading stage, where Johnson's plausible allegations regarding the limitations of the debriefing process must be taken as true.

*Second*, and relatedly, it would not in any case matter if Arizona reviewed Johnson's placement monthly or even daily, because Johnson plausibly alleges that Arizona's current review process offers him and prisoners like him no effective way out of maximum custody even if they no longer pose any threat to prison security. FAC ¶¶ 37-39. Specifically, Johnson, who is proceeding *pro se*, alleges that he "doesn't receive a meaningful reviewment [sic] of his yearly reclass as an STG inmate" because the annual reviews, while appearing "[a]t face value . . . [to provide] some due process," in fact provide no real process of any kind because the outcome is predetermined: Arizona will "keep [Johnson] in maximum security solitary confinement simply because [Johnson] is an STG inmate who hasn't debriefed." FAC ¶ 37. Arizona's "classification and subsequent reassignment reviews are based solely on Plaintiff's alleged gang affiliation, without regard to his criminal history, propensity for violence, or disciplinary record. . . ." *Id.* Johnson alleges that Arizona's "conditioning release from STG status on debriefing" leads to a lack of any "meaningful opportunit[y]" to contest his placement. FAC ¶ 39. In my view, these allegations require at the very least that Johnson be given the opportunity to proceed to discovery so that he can test whether Arizona in fact makes his release from solitary confinement solely conditional on his engaging in debriefing, and, if so, whether there exist other alternatives sufficient to Arizona's legitimate security interests.

In this regard, the majority argues, bewilderingly, that "[t]his is not a *Mathews v. Eldridge* challenge to Arizona's

procedures" and instead "sounds in substantive due process." Opinion at 31. But Johnson's claim is that Arizona's categorical refusal to consider any evidence other than two facts -- a near-decade old STG validation, and Johnson's subsequent failure to debrief -- results in an unreasonably high probability that Johnson will be wrongfully deprived of his acknowledged liberty interest in avoiding the conditions of maximum custody. He contends that other procedures -- namely, procedures allowing consideration of other factors bearing on Johnson's dangerousness -- might lead to a different outcome. It is hard to imagine a more typical procedural due process argument. *See, e.g.*, *Mathews*, 424 U.S. at 333-34 (discussing, as part of the Court's evaluation of the probable value of additional procedure, the types of evidence that would be relevant to a given type of determination, and what procedures would be necessary to enable consideration of the relevant evidence); *Larita-Martinez v. INS*, 220 F.3d 1092, 1095-96 (9th Cir. 2000) (discussing, as an element of procedural due process, the requirement that a decisionmaker consider relevant evidence).

Indeed, it is the majority that abandons the familiar *Mathews* balancing framework in favor of categorical presumptions favoring one party. It insists that Arizona's "subjective evaluation . . . that an inmate's STG membership and failure to debrief represents a continuing and significant risk to prison safety such that it justifies the inmate's confinement to maximum custody" must be accorded "significant deference." Opinion at 32-33. But the majority in fact affords that "subjective" determination dispositive weight, allowing Arizona's mere assertion of it -- at the pleading stage, no less -- to trump any and all other considerations, including the likelihood that considering

additional evidence might result in a different judgment as to whether Johnson poses a threat, and the likely cost of considering such additional evidence. Indeed, under the majority's telling, even if Johnson could show that some other factor (perhaps a prisoner's criminal or disciplinary history, or the subjective opinion of prison staff) was both easily ascertainable and had a 100% track record in predicting whether or not that prisoner's release from maximum custody would pose any danger to other prisoners or the prisoner himself, the prison's "subjective" decision to ignore that factor would be immune from challenge. That cannot be right under the *Mathews* framework.

To support this counter-intuitive result, the majority cites language from the Supreme Court's decision in *Hewitt v. Helms*, 459 U.S. 460 (1983), arguing that "*Hewitt* established that prison officials' judgment that an inmate represents a threat to the safety of the prison may "turn[] largely on 'purely subjective evaluations and on predictions of future behavior' and may be appropriate 'even if [the inmate] himself has committed no misconduct.'" Opinion at 32 (quoting *Hewitt*, 459 U.S. at 474, abrogated in part on other grounds, *Sandin v. Conner*, 515 U.S. 472 (1995)). But while *Hewitt* certainly afforded significant weight to the government's interest in prison security -- and real deference to prison officials' judgment about how best to achieve that interest -- it also carefully applied the *Mathews* framework, independently weighing the government's security interests alongside the prisoner's interest in avoiding solitary confinement and the probable value of additional procedural safeguards. *Hewitt*, 459 U.S. at 474.

In the context presented in that case -- the decision whether to continue to segregate a particular prisoner mere weeks after a prison riot, when the situation in the prison

continued to be volatile -- the Court found the private interest at stake (continuing to be held in segregation for a few more weeks "pending completion of an investigation into misconduct charges against" that prisoner, *id.* at 463-64, 476) not particularly weighty, and the proposed requirement of a live adversary hearing unnecessary. *Id.* at 474-75. It also acknowledged that predictions about when a particular prisoner's presence in the general population might cause violence are "subjective" and may turn in part on facts about general prison conditions not attributable to a particular prisoner's conduct. *Id.* at 474. But the Court in *Hewitt* made absolutely clear that "administrative segregation may not be used as a pretext for indefinite confinement of an inmate," that "[p]rison officials must engage in some sort of periodic review of the confinement of such inmates," and that such a review should take into account both "facts relating to a particular prisoner," "the officials' general knowledge of conditions and tensions," "the progress of [any] investigation," and "a wide range of administrative considerations." *Id.* at 477 n.9. [2] In other

---

[2] To be sure, *Hewitt* stated that the assessment that a particular prisoner remains a continuing threat may in part "be based on facts relating to a particular prisoner . . . ascertained when determining to confine the inmate to administrative segregation." *Id.* But the context for that statement was a discussion of whether a prison could continue segregating a prisoner mere weeks after a prison riot; the Court certainly did not imply that the prison would *never* need to consider new facts about the specific prisoner, and, indeed, its analysis was explicitly based on the premise that new facts would be considered when an ongoing investigation into the prisoner's conduct was concluded. *Id.* at 463-64, 477 n.9. And in any event, the Court in *Hewitt* concluded that the prison needed to consider any previously ascertained facts about the prisoner *alongside* new facts about prison conditions, such as whether "prison tensions in the aftermath" of the riot and an "ongoing state criminal

words, *Hewitt* established that even for relatively brief periods of administrative segregation, due process requires consideration of a wide variety of factors. It provides no support for Arizona's determination to confine Johnson and other prisoners in what amounts to solitary confinement for years and possibly decades while considering only an initial STG validation and the subsequent failure to debrief.

For these reasons, it seems clear to me that Johnson should at least be entitled to proceed past the pleadings on his claim that Arizona's refusal to consider factors other than his initial STG validation and his subsequent failure to debrief denies him due process. He has alleged that the consideration of additional factors -- specifically, his "criminal history, propensity for violence, or disciplinary record" -- might lead Arizona to determine, with greater accuracy, whether he poses a threat to prison security. FAC ¶ 37. Perhaps he is wrong that consideration of these factors would lead to a more accurate determination, or perhaps Arizona could show that it is overly burdensome to consider these factors, even if they are predictive of violence. But to settle these questions against Johnson at the pleading stage usurps the factfinder's role and eliminates from the *Mathews* analysis any consideration of the probable value of additional procedures, instead collapsing it into a one-pronged inquiry as to whether the government has asserted a legitimate security interest. That inquiry stacks the deck against the person asserting a liberty interest and in favor of the government.

---

investigation" continued to warrant segregation. *Id.* at 477 n.9.

## B. *The Significance of Debriefing*

The majority's response to all of this is to argue that Johnson's "recourse for the time being is to renounce his membership, thereby altering his status as a Warrior Society member." Opinion at 29; *id.* at 34 ("[I]t is appropriate for ADC to rely on Johnson's STG validation status as justification for its conclusion that he remains a security threat. . . ."); *id.* at 37-39 (discussing the debriefing process). But here, even granting the majority's premise that consideration of current gang affiliation standing alone and to the exclusion of all other factors might justify prolonged solitary confinement, Arizona would still need to show that a years or decades-old STG validation, coupled with a prisoner's subsequent failure to debrief, actually *establishes* current gang status. That premise is far from clear, and cannot be ascertained at the pleading stage. *See Boquist v. Courtney*, 32 F.4th 764, 773-74 (9th Cir. 2022) ("[D]ismissal is proper under Rule 12(b)(6) if it appears beyond doubt that the non-movant can prove no set of facts to support its claims."). Indeed, "where, as here, a plaintiff proceeds pro se," the district court was obliged to "'construe the pleadings liberally' and 'afford [Johnson] the benefit of any doubt.'" *Id.* at 774; *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed pro se is 'to be liberally construed,' and 'a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'").

Rather than draw plausible inferences in Johnson's favor and construe his pro se complaint liberally, the district court -- and, now, the majority -- rush to resolve the disputed factual question of whether a years-old STG validation suffices to establish current gang status or dangerousness. There is of course no factual record as yet as to Johnson's

claim that by conditioning his release from maximum custody on debriefing, Arizona effectively denied him any "meaningful opportunity" to demonstrate he was no longer a threat. FAC ¶ 39. And it was not Johnson's obligation at this preliminary stage of the litigation to allege anything more than that by conditioning his placement on debriefing, Arizona had effectively denied him the opportunity to leave maximum custody. But even looking ahead to future stages of litigation, it seems likely -- and, at the very least, plausible -- that Johnson could demonstrate that the opportunity to debrief does not provide him any meaningful path out of his extremely restrictive conditions of maximum security.

*First*, as the Supreme Court has emphasized, "[t]estifying against, or otherwise informing on, gang activities can invite one's own death sentence." *Wilkinson v. Austin*, 545 U.S. 209, 227 (2005). Indeed, the concern that prisons cannot easily investigate gang violence and prevent retaliation after the fact is one of the reasons the Supreme Court has instructed courts to be reasonably deferential to prison procedures designed to prevent gang violence in the first place. *Id.* At the pleading stage, it certainly seems plausible that Johnson could demonstrate that he could not debrief without facing deadly danger. *See Madrid v. Gomez*, 889 F. Supp. 1146, 1241 (N.D. Cal. 1995) ("[A] number of prison staff agree that inmates who debrief and gain release from the SHU are considered "snitches," and thus face serious risks of being attacked or even killed by other inmates.").

*Second*, largely because of the acknowledged danger that prisoners who have debriefed face from other prisoners, Arizona has pointed to prison regulations requiring that any prisoner who debriefs be placed in a form of "protective custody," the purpose of which is to continue to separate the

debriefed prisoner from other prisoners. DO § 806.07.1.5.1. As Johnson's challenge to his current placement turns on his "minimum human contact for years on end," which, "even within the context of the prison system . . . represents a severe deprivation of liberty," FAC ¶ 38, Arizona cannot satisfy due process by offering Johnson the opportunity to trade one form of solitary confinement for another form of the same thing that would equally deprive him of a constitutional liberty interest. Arizona points to regulations that purportedly would allow a prisoner who has debriefed and been placed into protective custody to one day become *eligible* for "custody reductions and housing changes," including "lower custody housing or a double cell environment." DO § 806.07.1.5.1. But assuming we can properly take notice of these regulations at the pleading stage, there is simply no basis in the pleadings or record to assess whether that theoretical eligibility actually offers Johnson or prisoners like him a plausible path out of what is effectively solitary confinement.

The majority acknowledges that this problem -- that a prisoner may not be able to debrief without either risking death or else simply trading one form of restrictive custody for another -- "is real . . . [but] cannot be avoided." Opinion at 40. But if it really is true that debriefing requires braving violent retaliation or indefinite solitary confinement, it seems reasonable to ask whether consideration of any other factors beyond a prisoner's failure to debrief might satisfy a prison's legitimate security needs. Whatever the answer to that question, I feel confident it cannot be resolved at the pleading stage.

*Third*, Arizona's regulations (again, assuming they are even properly before us at this stage) on their face raise the plausible inference that many prisoners (likely including

Johnson) may not be able to successfully debrief even if they wished. Under those regulations, no prisoner can debrief without first "provid[ing] additional information regarding the STG's structure, activity and membership that would adversely impact the STG and assist in management of the STG population." DO § 806.06. Even assuming that a properly validated prisoner would be able to do this at the time of his validation, it is not at all clear how a prisoner who was validated eight years ago and has been held in solitary confinement ever since could possibly be in a position to provide any information that would "adversely impact the STG" or "assist" the prison in "management of the STG population."

Johnson was validated in 2014 and Arizona has since twice allowed him to begin the SDP program, which he would not have been allowed to do on either occasion under Arizona's regulations if he had had any STG-related activity within the past two years. FAC ¶¶ 4, 9; DO § 806.08.1.2.2. It may be theoretically *possible* that, nearly a decade following Johnson's initial validation after which time he was totally segregated from other prisoners, and despite Arizona's judgment that Johnson participated in no STG-related activity for much or all of that time, Johnson could still provide some information that "would adversely impact the STG."[3] Or perhaps Arizona could show that it does not enforce this requirement for prisoners who are no longer in a position to provide such information. But none of these

---

[3] It bears mentioning that Johnson has denied that he was ever properly validated as an STG member in the first place, and, in separate litigation, this Court previously reversed a district court's grant of summary judgment against Johnson on this claim. *Johnson v. Bendel*, 745 F. App'x 750 (9th Cir. 2018). Following the appointment of counsel for Johnson, Johnson obtained a cash settlement from Arizona.

possibilities is clear from the face of Johnson's complaint, and none justifies dismissing it.

The majority dismisses this concern about the potential unavailability of debriefing to a prisoner who has been confined for years on-end and who therefore lacks current information about the STG into which he was validated, arguing that "[t]hese claims are not established anywhere in this record" and belong instead to the "dissent's own imagination." Opinion at 38. This, once again, ignores the fact that this case is still at the pleading stage, not to mention that it involves a *pro se* pleading. Johnson's claim that Arizona must consider more than his failure to debrief in order to hold him in maximum custody for years on end has never proceeded to discovery, so there is, of course, no factual record affirming or disputing this point. But the possibility that debriefing might not be a viable option for a prisoner who has been held in maximum custody for many years more than plausibly follows from Arizona's regulations requiring satisfactory debriefing to establish information about the STG.

Instead, it is the majority that takes it upon itself to imagine facts beyond the pleadings (and, for that matter, an entire record as to this claim), where no such facts have yet been established by either party.[4] Johnson has alleged that

---

[4] In its rush to create a record where none exists, the majority has taken upon itself to examine the website of Arizona's Department of Corrections to supposedly confirm that "[t]he Warrior Society still operates as a prison gang and has active members in Arizona prisons." Opinion at 35 (citing Ariz. Dep't of Corr., Certified and Monitored Security Threat Groups, https://corrections.az.gov/warrior-society-0). It thereby seeks to demonstrate that, at the very least, Arizona is not confining Johnson over his supposed membership in a now-defunct gang -- even though nothing about Arizona's process, which looks only to the

by "conditioning release from STG status on debriefing," Arizona effectively denied him any "meaningful opportunit[y]" to leave solitary confinement. FAC ¶ 39. Arizona may or may not be able to adduce evidence showing that this was not the case, but Johnson was not obliged to specifically anticipate and plead around such evidence in his pro se complaint. *Cf. Zivokovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002) (reasoning that "[a] defense which demonstrates that plaintiff has not met its burden of proof is not an affirmative defense" and therefore need not be specifically pleaded in a defendant's answer, let alone in a plaintiff's complaint).

Indeed, in dismissing Johnson's claim at the pleading stage, the district court cited cases sustaining Arizona's system of indefinite maximum security placement because prisoners could theoretically leave maximum security by debriefing at "any time." But every case cited by the district court came at the summary judgment stage, after the plaintiffs (usually proceeding pro se and in prison) had failed

---

initial STG validation and the subsequent failure to debrief, *requires* that the gang into which a prisoner was validated remains operational. But the majority's beyond-the-pleadings research only confirms why Johnson's claim should proceed to discovery. The webpage it cites states that while "[t]he majority of the Native American inmates coming into the prison system join the Native American Brotherhood," or N.A.B., only "the younger, stronger and more aggressive inmates. . . . could be considered the 'elite' N.A.B., the Warrior Society." *See* Ariz. Dep't of Corr., Certified and Monitored Security Threat Groups, https://corrections.az.gov/warrior-society-0 (last visited November 8, 2022). This characterization of the Warrior Society as constituted primarily by the "younger, stronger, and more aggressive inmates" is not wholly consistent with the majority's assumption that prisoners remain active members of the Warrior Society for years or even decades unless and until they debrief.

to meet their burden to affirmatively adduce evidence demonstrating that debriefing was not a viable option. *See Hernandez v. Schriro*, No. 05-cv-2853, 2011 WL 2910710, at *8-9 (D. Ariz. July 20, 2011) (rejecting plaintiff's "unsupported assertion that risks to debriefed inmates are 'common knowledge'. . . [because] [t]o defeat summary judgment, Plaintiff must present *evidence*" (emphasis added)); *Mendez v. Ryan*, No. 10-cv-1867, 2013 WL 6408389, at *8-*11 (D. Ariz. Aug. 13, 2013) (similar); *Standley v. Ryan*, No. 10-cv-1867, 2012 WL 3288728, at *9-10 (Aug. 13, 2012 D. Ariz. 2012) (similar); *Faulkner v. Ryan*, No. 10-cv-2441, 2012 WL 407452, at *9-10 (D. Ariz. Feb. 9, 2012) (similar). District courts that have considered similar allegations at the pleading stage have routinely found them sufficiently plausible to proceed to discovery. *See Askher v. Brown*, No. 09-cv-5796, 2013 WL 1435148, at *7 (N.D. Cal. April 9, 2013) (finding allegations that the possibility of debriefing did not offer a meaningful path out of solitary confinement at California prisons plausible at the pleading stage); *Fanaro v. Cty. of Contra Costa*, No. 09-cv-03247, 2019 WL 5191018, at *5 (N.D. Cal. Oct. 15, 2019) (similar); *Gonzales v. Guirbino*, No. 14-cv-00173, 2016 WL 1599449 at *2-5 (E.D. Cal. April 21, 2016) (similar).

Similarly, the majority relies extensively on a "lengthy, thorough" 1995 district court decision in *Madrid v. Gomez*, 889 F. Supp. 1146 (N.D. Cal. 1995) that held that California prisons could rely on the fact of a relatively old STG validation -- even in the "absence of gang-related activity or association over some period of time" -- to continue to hold a prisoner in solitary confinement. Opinion at 34 (quoting *Madrid*, 889 F. Supp. at 1278). But the court in *Madrid* reached that determination only after a trial in which it "heard testimony from 57 lay witnesses, including class

members, defendants, and correctional employees at all levels," and "received into evidence over 6,000 exhibits, including documents, tape recordings, and photographs, as well as thousands of pages of deposition excerpts," and even "spent two days touring [the prison], accompanied by counsel for both parties and prison officials." *Madrid*, 889 F. Supp. at 1156. The court's determination that a prisoner's status as a gang member might continue to demonstrate that prisoner's dangerousness and might be determined by an old STG validation, notwithstanding the absence of recent gang-related activity, was made only "in light of [the court's] factual findings," and its resulting determination that "the record supports defendants' position that gang members and associates are threats to prison security, and that inmates who join such gangs join 'for life' . . . [even if] the inmate may not have affirmatively engaged in gang activity" for some time. *Id.* at 1278. Further, while the court in *Madrid* heard evidence as to whether debriefing was in fact "necessary to prove that renunciations of gang membership are genuine," and as to the threat debriefing might or might not pose to particular prisoners, it also noted that the plaintiffs in that case had not challenged the constitutionality of the prison's debriefing policy, and as such the court declined to consider or address that issue. *Id.* at 1243, 1270 n.217.

*Madrid*, in other words, demonstrates precisely why Johnson's claim cannot be dismissed on the pleadings, even assuming, as the majority does, that current gang status alone demonstrates dangerousness. Whether a years-old STG validation, coupled with a subsequent failure to debrief -- but also an apparent absence of any gang-related activity -- actually demonstrates present gang affiliation and dangerousness is a factual question, subject to factual

dispute. The fact that a district court resolved this factual question one particular way with respect to a specific California prison's policies almost 30 years ago following a trial and the consideration of extensive evidence cannot justify resolving this question the same way against Johnson at the pleading stage.

For the reasons described above, I would hold that Arizona must review Johnson's placement in maximum custody more than once a year, and I would also allow Johnson to proceed to discovery as to his claim that Arizona violates due process by failing to consider any factors beyond a many-years-ago STG validation and a prisoner's subsequent failure to debrief before confining him indefinitely in maximum custody. In my view, if Johnson can demonstrate that consideration of other facts beyond a prisoner's current gang affiliation would both lead to more accurate determinations about whether that prisoner poses a threat and are not overly burdensome to consider, then Arizona must then consider those other factors. But even if that were not the case, and the majority were correct that a prisoner's current gang status, standing alone, justifies indefinite solitary confinement, I do not view the bare fact of a years-old STG validation and the mere possibility of debriefing as sufficient to establish current gang status at the pleading stage.

## II.     Whether Johnson's removal from the SDP violates due process.

I concur in the majority's judgment reversing the district court's grant of summary judgment as to Count I of Johnson's complaint (which alleged that he was terminated from the SDP program and reassigned to extremely restrictive conditions of maximum custody in the Browning

unit without adequate due process). I also agree with the majority that "the procedure that it appears Johnson was given was not adequate to satisfy the Due Process Clause." Opinion at 59. However, I do not agree with the majority's conclusion that only Johnson's reassignment of housing units -- rather than his underlying termination from the SDP program, which is what led to his reassignment -- gave rise to a constitutionally protected liberty interest. This is so for two reasons.

*First*, the majority is wrong that "removal from the SDP during Phases I–III does not result in any significant change in an inmate's conditions of confinement." Opinion at 49. Participation in any phase of the SDP has significant implications for a prisoner's current living conditions, rendering those conditions materially freer than those of most prisoners in maximum custody. *See* DOC 806.06, § 1.5.3 (explaining that prisoners in Phase III may receive two-person recreation periods, job assignments, and an unrestrained meal every day with other prisoners, along with a variety of trainings and access to other programming); *id.* § 1.5.2, (explaining that prisoners in Phase II be allowed to attend "peer group interaction (town hall meetings)," unrestrained walks to and from the shower, unrestrained walks to and from a recreation area, and access to various other forms of programming); *id.* § 1.5, (in Phase I, prisoners will have access to a "high school equivalency preparation program," as well as a number of other different classes and programs).

As Arizona's regulations make clear, participation in *any* stage of the SDP -- and, at the very least, participation in Phases II and III, as well as Phases IV and V -- entails significantly more freedom from restraint and social exposure than ordinary placement in maximum custody. So,

to the extent that Johnson's removal from Phase IV led to "a material change in [Johnson's] living conditions" implicating a liberty interest, Opinion at 53, so too would a prisoner's removal from any prior phase -- and, at the very least, from Phases II and III. The majority argues that eliminating the freedoms enjoyed by prisoners in Phases I, II, and III of the SDP would not "rise[] to the level of an 'atypical or significant hardship.'" Opinion at 51 (quoting *Sandin*, 515 U.S. at 484). But, as described, above, many of the freedoms allowed in at least Phases II and III quite literally involve giving prisoners limited "freedom from restraint," which is the quintessential sort of liberty interest as to which due process rights attach. *Sandin*, 515 U.S. at 484.

*Second*, the majority is wrong to conclude that removal from the SDP simply results in merely the loss of "one means by which Johnson can prove that he is prepared to return to the general prison population." Opinion at 48. As described above, except for the single alternative of debriefing (the material shortcomings of which have already been outlined), removal from the SDP effectively guarantees that a prisoner will be confined in maximum custody for at least 24 more months or, in the case of a second removal from SDP, indefinitely. Whether or not the participating prisoner's transfer from maximum to close custody at the beginning of Phase IV has already occurred simply sidesteps the central issue, which is that at *any* phase of SDP, an SDP participant remains eligible to ultimately "step down" from maximum custody and ultimately transition to the general population, whereas once that participant is removed from SDP, he will face at least two more years of segregation in the case of a first removal and indefinite segregation in the

case of a second removal unless he debriefs.[5]

Of course, the majority is in some sense correct that it is a Johnson's "STG status, not [his participation in] the SDP" that results in his maximum custody placement. Opinion at 48. But for Johnson's STG validation, he would not have been confined in maximum custody and therefore would never have been eligible for the SDP program, or had any need to participate in it. But, by that logic, Johnson's return to maximum custody -- which the majority concedes implicates a liberty interest, Opinion at 52-55 -- *also* depended on Johnson's STG status. So while the majority is correct in holding that Johnson's removal from less restrictive custodial conditions caused by his removal from Phase IV of the SDP implicates a liberty interest, its logic for so holding necessarily implies more: that so long as the SDP remains a prisoner's only plausible mechanism out of maximum custody, Arizona cannot terminate the prisoner

---

[5] The majority claims that acknowledging the liberty interest associated with SDP participation would put courts "in the business of second-guessing every decision that ADC officials must make during Phases I-V to determine whether an inmate may advance to another phase or remain in the program." Opinion at 52 n.12. But its approach would yield exactly the same result for Phases IV and V, as a prisoner's failure to meet any of the criteria necessary to complete either phase would necessarily result in that prisoner's removal from close to maximum custody, which the majority acknowledges infringes upon a liberty interest and therefore must comply with due process. Opinion at 52-55. To be sure, when prison officials act to deprive prisoners of a liberty interest -- whether that interest is defined as participation in the SDP, or removal from the freer custodial conditions that participation in a particular stage of SDP necessarily implies -- they must afford the prisoner basic due process, including notice and an opportunity to be heard. But enforcing these basic guarantees of due process with all due regard for the exigencies of prison management does not mean that courts will be forced to second-guess everyday penological decisions.

from SDP without providing due process.

For the foregoing reasons, I respectfully dissent from the majority's decision affirming the district court's dismissal of Count III of Johnson's complaint. Put simply, the very real problem of maintaining prison security in the face of gang activity is not a blank check allowing prison officials to overrule the Constitution and keep a prisoner once identified as a gang member in solitary confinement forever without any genuine possibility of release. And while I concur in the majority's judgment reversing the district court's grant of summary judgment against Johnson as to Count I, in my view Johnson's removal from the SDP itself, and not just his collateral housing reassignment, implicated a liberty interest. Finally, I concur fully in the majority's holding that the district court erred in entering summary judgment against Johnson as to his First Amendment retaliation claim.